**WAL-LITE DIVISION OF UNITED STATES GYPSUM COMPANY, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD.**

No. 72–1773.

United States Court of Appeals, Eighth Circuit.

Submitted May 15, 1973.

Decided Sept. 5, 1973.

 

John A. McDonald, Price, Cushman, Keck & Mahin, Chicago, Ill., for petitioner.

Russell H. Gardner, N. L. R. B., Washington, D. C., for respondent.

Before MEHAFFY, Chief Judge, MATTHES, Senior Circuit Judge, and STEPHENSON, Circuit Judge.

MEHAFFY, Chief Judge.

This case is before us pursuant to a petition to review and set aside an order of the National Labor Relations Board reported at 200 N.L.R.B. No. 132 (Dec. 22, 1972) and the Board's cross-application for enforcement of its order. The three-member Board, with its Chairman dissenting, found that United States Gypsum Company had violated § 8(a)(1) and (5) of the National Labor Relations Act by refusing to bargain in good faith with the United Steelworkers of America, AFL–CIO. We thoroughly agree with the Chairman's very logical and well reasoned analysis of this case, and for that reason and others as hereinafter set forth we grant the petition to review and set aside the order and deny the cross-application for enforcement.

The background facts of this case can be briefly summarized. On August 1, 1970 United States Gypsum Company purchased Wallace Manufacturing Company, a wall paneling factory in Pittsburgh, Kansas. At the time of the purchase the Wallace employees were represented by the United Steelworkers of America and there was approximately one year remaining on the three-year contract that the Union had negotiated with Wallace. Although under no obligation to do so, United States Gypsum voluntarily agreed to honor the Union's contract until it expired. Some two and one-half months prior to the expiration of this contract United States Gypsum opened negotiations with the Union concerning a new contract. In the course of the negotiations United States Gypsum bargained for an agreement that

was based largely on a contract the Company then had in effect with the same Union at its plant in Pinckneyville, Illinois. The Union, on the other hand, bargained for an agreement that was based largely on the contract the Union had formerly secured from Wallace. Both parties were equally adamant that their respective positions should be the starting point for any negotiations. After two and one-half months of bargaining the parties were unable to resolve their basic disagreement. Finally, on June 13, 1971 at the recommendation of the Union's representative, the employees voted to reject the Company's most recent offer and go out on strike.

The basic issue in this appeal is whether United States Gypsum engaged in an unfair labor practice by refusing to bargain in good faith. Of course, the record is clear that the Company did in fact negotiate with the Union, but the Union and the Board contend that these negotiations were nothing more than "surface bargaining," and that the Company never intended to bargain in good faith.

After an evidentiary hearing the Administrative Law Judge (formerly the trial examiner) concluded that the Company had violated § 8(a)(1) and (5) of the National Labor Relations Act by refusing to bargain in good faith. The Board, with its Chairman dissenting noted that the Administrative Law Judge relied essentially on a statement of the Company's labor relations manager at the end of the grievance meeting and two letters from the Company to its employees. It agreed with his conclusion but did so for additional reasons which emphasized the Company's intransigence in insisting on broad scale departures from the old Wallace contract. According to the majority, the Company's proposals were so inadequate that it "could not reasonably have expected the Union to acquiesce."

█ Turning first to the Board's additional reasons and examining the record we find that the Company's pro-

posal was based on and similar to a contract this Union had signed with the Company at its Pinckneyville plant. It would seem obvious that the Company could reasonably expect the Union to accept the proposal, at least as a starting point in the negotiations. Certainly no inference of bad faith could be drawn from the fact that the Company made this proposal. However, the Company's final proposal, submitted five days before the Wallace contract was to expire, offered a wage scale providing increases for all employees ranging from fifteen to thirty-five cents per hour, an insurance plan with better coverage at lower cost for the employees and a pension plan with higher retirement benefits. The only inadequacy of the Company's proposal was by comparison to the Wallace contract. The Union admitted the Wallace contract had led to inefficient and uneconomic operations. The dissenting Chairman found, and the record supports his finding, that the Union admitted "that the employees did not put in a full day's work and that the Wallace contract terms and . . . work rules . . . had accounted in large part for that situation." That contract and its side agreements contained such restrictive clauses as a provision which required the Company to pay one-half day's pay to any employee who saw a foreman working. Under this provision a grievance was filed when a foreman worked seven seconds, apparently pouring a solvent across the rollers of a machine to prevent paint from drying on the rollers while the machine operator was in the bathroom. The Company introduced a study made of one of its competitors which showed that the competitor had a similar plant but only employed twenty-seven people on its production line while Wal-Lite employed forty-eight. The competitor produced approximately twice as many boards per shift than did Wal-Lite. In spite of the inefficiency of the plant's operation under the Wallace contract, the Union offered as its proposal a modification of that contract which basically struck from the Wallace contract ref-

erences to ability, experience and qualifications as those terms related to job bidding, job transfers and overtime.

In light of the economically wasteful operation of the plant under the Wallace contract, we do not find it surprising that the Company refused to accept the Wallace contract as the starting point for negotiations. Nor were they required to do so. The Company's only obligation after the purchase was to recognize the Union and bargain in good faith with it. NLRB v. Burns Int'l Security Services, Inc., 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972). The Company not only did this but it also voluntarily agreed to abide by the Union's contract until it expired by its own terms.

We agree with the conclusion of the Board Chairman that "the case built up against [the Company] . . . rests, in the main, on the adamant refusal of [the Company] to acquiesce in the Union's equally adamant demand to treat the benefits secured by the Union from Wallace as vested benefits and to bargain upward from that point." The duty to bargain as set forth in § 8(d) of the Act, 29 U.S.C. § 158(d), requires that the parties meet and confer in good faith. However, § 8(d) "does not compel either party to agree to a proposal or require the making of a concession. . . ." In discussing this section and its history the Supreme Court in H. K. Porter Co., Disston Div.-Danville Works v. NLRB, 397 U.S. 99, 106, 90 S.Ct. 821, 825, 25 L.Ed.2d 146 (1970), quoted one of its earlier decisions that "it is 'clear that the Board may not, either directly or indirectly, compel concessions or otherwise sit in judgment upon the substantive terms of collective bargaining agreements.' " The Court in *Porter,* in holding that the Board could not compel agreement, stated: "It cannot be said that the Act forbids an employer or a union to rely ultimately on its economic strength to try to secure what it cannot obtain through bargaining." 397 U.S. at 109, 90 S.Ct. at 826. Without sub-

stantial evidence that a negotiating party's attitude is inconsistent with its duty to seek an agreement, the mere fact that it adamantly insists on a bargaining position or has not budged from its position on most issues cannot suffice to render it guilty of a refusal to bargain in good faith. NLRB v. MacMillan Ring-Free Oil Co., 394 F.2d 26 (9th Cir.), cert. denied, 393 U.S. 914, 89 S.Ct. 237, 21 L. Ed.2d 199 (1968); NLRB v. Almeida Bus Lines, Inc., 333 F.2d 729 (1st Cir. 1964).

> " 'If the insistence is genuinely and sincerely held, if it is not mere window dressing, it may be maintained forever though it produce a stalemate. Deep conviction, firmly held and from which no withdrawal will be made, may be more than the traditional opening gambit of a labor controversy. It may be both the right of the citizen and essential to our economic legal system * * * of free collective bargaining.' (Citation omitted.)" NLRB v. Almeida Bus Lines, Inc., *supra,* at 731.

In the present case, by the time the proposals for both parties were on the table, it was clear that each side was insisting upon its own bargaining position. Yet agreements and concessions were made. In looking at the negotiations themselves we find that the Company changed its position on such provisions as conditions for receiving holidays, overtime, vacations and funeral leave. The parties agreed on, among other things, the amount of shift differentials and conditions governing shift differentials and provisions and pay for employees called or scheduled to work when there was insufficient work. We cannot characterize the agreements made and the Company's changes as minor or unimportant as the Board has done. Rather, in a situation where both parties are insistent on their positions as they had the right to be, we find their agreements are strong evidence of good faith. We note the statement attributed, without contradiction, to the Union's representative that he "supposed

that both parties had negotiated to the point of satisfying the law and he didn't feel that the parties could be hung for not negotiating."

The Administrative Law Judge specifically found that the Company's representative ". . . willingly met with the Union's representatives; he explained his proposals; he talked about the Union's counterproposals; and, despite his so-called best and final offer on June 10, he did not refuse further meetings or discussions." Even though the Administrative Law Judge demeaned these negotiating efforts by the Company as merely a "well-tutored regard for the external appearances of collective bargaining", he nonetheless concluded that "if the evidence in the case was limited to what had transpired during the formal meetings between the Union and the Company, I would hesitate to find that General Counsel has proved the alleged violations of the Act."

 The evidence that persuaded the Administrative Law Judge to conclude that the Company had bargained in bad faith was the alleged statement of a Company official and the two Company letters to its employees. The statement was allegedly made at the end of a grievance hearing some seven months before commencement of negotiations, not by the Company's bargaining representative but by the industrial relations officer of the Company in Chicago.[1] According to Crain, the Union representative, the statement was to the effect that the officer's mission was to "break" the Union. We have serious doubts as to Crain's credibility. He did not mention this statement in his pretrial affidavit to General Counsel even though Crain testified that he could never forget the statement. A witness for the Company testified that no meeting after the grievance hearing occurred. Assuming, arguendo, that the statement

was made, it cannot, of course, be used as the basis of a finding of an unfair labor practice since it occurred approximately nine months before the complaint was filed. See § 10(b), National Labor Relations Act; NLRB v. MacMillan Ring-Free Oil Co., *supra.* Nor do we think that the isolated comment of the officer, made some nine months before filing the complaint, supports the Board's finding. We so hold considering the absence of other evidence of illegal acts of the Company and the affirmative evidence of good faith bargaining.

> "Individual acts or statements of a negotiating party which appear contrary to the required attitude cannot be drawn upon to dilute a finding of good faith where the totality of the party's conduct conforms to the dictates of the statute." NLRB v. Almeida Bus Lines, Inc., *supra*, 333 F.2d at 731.

Sign & Pictorial Union Local 1175 v. NLRB, 136 U.S.App.D.C. 144, 419 F.2d 726 (1969). See, Local 1424, IAM v. NLRB, 362 U.S. 411, 80 S.Ct. 822, 4 L. E.2d 832 (1960); NLRB v. MacMillan Ring-Free Oil Co., *supra.*

 As to the Company's letters, we agree with the dissenting Chairman that they were no more than privileged expressions of the Company's viewpoint. The right of expression given an employer by § 8(c) of the Act, 29 U.S.C. § 158(c), "we equate with what in other branches of the law is described as the right of fair comment." Caribe General Electric, Inc. v. NLRB, 357 F.2d 664, 665 (1st Cir. 1966). We do not think the Company exceeded that right here.

 When this case is analyzed by any rule of law or fairness, the conclusion reached by the Board Chairman is the only one applicable here as the present Board decision under any guidelines would make a mockery of the basic

---

1. While we do not find the relationship between the officer in Chicago and the Company's bargaining representative to be of any significance in this case, the industrial relations officer drafted various letters and the contract proposals. However, the testimony clearly shows that they were drafted in accordance with the wishes of the Company's bargaining representative after conferences between the two.

fundamentals of the Board's function. It seems clear in this case that the Board was relying on the fact that the Company adamantly insisted on a bargaining position and that the Board did not approve of the fact that the Company did not concede issues the Union was insisting upon. The Board was indirectly, if not directly, sitting in judgment upon the substantive terms of the parties' bargaining agreement which it does not have authority to do.

Accordingly, the petition to set aside the order is granted and the cross-application for enforcement is denied.