**QUEEN MARY RESTAURANTS CORP. and Q. M. Foods, Inc., Petitioners,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 75–2691.

United States Court of Appeals, Ninth Circuit.

Sept. 2, 1977.

James C. Roberts, Gibson, Dunn & Crutcher, Los Angeles, Cal., argued for petitioners.

Elliott Moore, William R. Stewart, Atty., N.L.R.B., Washington, D. C., argued for respondent.

Before CHAMBERS and GOODWIN, Circuit Judges, and WHELAN,* District Judge.

GOODWIN, Circuit Judge:

In this petition for review and cross-application for enforcement, the NLRB represents the charging party, the Marine Cooks and Stewards Union (Marine Cooks), against the Queen Mary Restaurant Corporation and its subsidiary, Q.M. Foods, Inc. (collectively, the Company).

The Board found that the Company had violated the National Labor Relations Act (the Act), 29 U.S.C. § 151 *et seq.*, by re-

* The Honorable Francis C. Whelan, United States District Judge for the Central District of California, sitting by designation.

fusing to bargain in good faith with the Marine Cooks, by threatening that unfair-labor-practice strikers would be permanently replaced, and by refusing to reinstate those strikers. Pursuant to these findings, the Board ordered the Company to bargain collectively with the Marine Cooks, to cease and desist from refusing to make proposals or counterproposals on hiring procedures and union security, to reinstate the unfair-labor-practice strikers, and to post notices and preserve evidence of compliance. The Board's decision is reported at 219 N.L.R.B. No. 134, 90 L.R.R.M. 1017 (1975). We have jurisdiction under §§ 10(e) and (f) of the Act, 29 U.S.C. § 160(e) and (f), and we hold that the Board's order must be enforced.

## I. BACKGROUND

The bargaining which is the subject of this litigation was the objective of a protracted and successful campaign for recognition on the part of the Marine Cooks. The Company runs the restaurants on the former liner Queen Mary, now anchored in concrete in Long Beach. The vessel is owned by the City of Long Beach, but food concessions are privately operated. Before the restaurants opened in May 1971, the Company entered into a collective-bargaining agreement containing union-security and union-hiring-hall provisions with the Local Joint Executive Board of Hotel and Restaurant Employees and Bartenders International Union of Long Beach and Orange County, AFL–CIO (Culinary Workers). At the time this agreement was made, no employees had been hired.

The Marine Cooks filed an unfair labor practice charge against the Company challenging the bargaining agreement. The agreement was nullified and recognition of the Culinary Workers was withdrawn. Three representation elections were then conducted. The first election eliminated the Culinary Workers as an employee representative. The second election was set aside by agreement of the parties. The Marine Cooks won the third election and were certified by the Board on December 27, 1972.

In another proceeding,[1] the Board found that during the course of the three elections, and in their aftermath, the Company had committed thirteen unfair labor practices. These ranged from stating that a Marine Cooks victory would be futile because it would be five years before the Company would agree to a collective-bargaining agreement, to offering a witness money to leave town rather than testify against the Company at the hearing on the charges.

Collective bargaining began in January 1973. Between January 18 and May 30, 1973, the Company and the Marine Cooks held fourteen negotiating sessions. While the parties agreed on several issues, the questions of union security, hiring procedure, seniority, and the health and welfare plan remained unresolved. The Marine Cooks focused their attention on the questions of union security and the hiring procedure, seeking some variety of the former and some form of union hiring hall. They offered various proposals and expressed a willingness to compromise but to no avail. The Company refused to agree to any form of union security or hiring hall proposed and refused to make counterproposals.

The Marine Cooks filed three unfair-labor-practice charges during this bargaining period. The last, on May 9, alleged failure to bargain in good faith. On May 25, the union called an unfair-labor-practice strike. In late July and August the Marine Cooks made three unconditional offers to return to work. The Company eventually responded that it viewed the strike as an economic strike and therefore would not reinstate permanently replaced strikers. This refusal led to a further unfair-labor-practice allegation.

The charges were consolidated for trial in 1974. The administrative law judge issued findings and a proposed order, which, with

---

1. Board cases 21–CA–11359 and 21–CA–11382. The Findings of the administrative law judge were adopted by the NLRB July 5, 1973.

one member dissenting, the Board adopted on July 30, 1975.

## II. THE REFUSAL TO BARGAIN IN GOOD FAITH

In our review, we must affirm the Board's decision on the facts if it is supported by substantial evidence on the record considered as a whole. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

The key question in this case is whether the totality of the Company conduct evidenced an intent to frustrate meaningful bargaining and thereby violated § 8(a)(5) of the Act. The Board concluded that it did. If this conclusion withstands review, the Board's characterization of the ensuing strike as an unfair-labor-practice strike is also sound and the portions of the Board's order requiring further collective bargaining and reinstatement of the strikers with back pay must be enforced.

■ The question whether an employer's conduct demonstrates an unwillingness to bargain in good faith or is merely hard bargaining often forces the trier to draw difficult inferences from conduct to motivation. Since the accuracy of such inferences depends in part on an understanding of the collective-bargaining process, "the Board has been afforded flexibility to determine * * * whether a party's conduct at the bargaining table evidences a real desire to come into agreement." *NLRB v. Insurance Agents Union*, 361 U.S. 477, 498, 80 S.Ct. 419, 432, 4 L.Ed.2d 454 (1960). "Findings as to the good faith of parties involved in collective bargaining is a matter for the Board's expertise and will not be upset unless unsupported by substantial evidence." *NLRB v. Dent*, 534 F.2d 844, 846 (9th Cir. 1976). The ultimate question involves the application of statutory considerations to complex facts, and a court will not lightly disregard the over-all appraisal of the situation by the Labor Board as one of those

agencies presumably equipped or informed by experience to deal with a specialized field of knowledge. *NLRB v. Holmes Tuttle Broadway Ford, Inc.*, 465 F.2d 717, 719 (9th Cir. 1972).

■ Our recognition of the Board's expertise also tends to limit our review of the inferences it chooses to draw. "If facts are open to conflicting inferences, we are not at liberty to draw an inference different from the one drawn by the Board, even though it may seem more plausible and reasonable to us." *NLRB v. Millmen, Local 550*, 367 F.2d 953, 956 (9th Cir. 1966).

■ In the case at bar, the Board determined from the totality of the circumstances that the company had engaged in surface bargaining with the Marine Cooks in its continuing fight against that union. The decision considered as "background" the unfair-labor-practices campaign waged against the Marine Cooks during and after the representation elections.[2] The antiunion animus demonstrated by this campaign was found to continue through the negotiation period leading the Company to take other actions with the intention of weakening the Marine Cooks and frustrating meaningful bargaining. These were found to be independent unfair labor practices. The Board found that the Company's adamant positions against union security and a union hiring hall were not held in good faith, but were adhered to as a strategy to forestall agreement. Finally, the Board found additional evidence of the Company's bad faith in certain of its actions in the negotiations themselves. An exhaustive review of the record convinces us that the Board's findings must be sustained.

### A. *The Independent Unfair Labor Practices*

(1) *Bargaining Directly With Employees*

■ The administrative law judge found that the Company violated §§ 8(a)(5) & (1)

---

**2.** Events occurring outside the six-month "statute of limitations" of § 10(b) of the Act may be considered as evidence shedding light on the conduct within the six-month period which is

being challenged. *NLRB v. Longshoremen's Local 13*, 549 F.2d 1346 (9th Cir. 1977); *NLRB v. Carpenter's Local 745*, 450 F.2d 1255 (9th Cir. 1971).

of the Act by meeting and bargaining directly with its employees on seniority. Joe Goren, the Marine Cooks negotiator, asked to be present at a forthcoming meeting between the Company and a group of employees. He was told that he could not attend because the meeting was "operational". Following the meeting, increased seniority was granted to those in attendance who requested it. Bypassing an exclusive bargaining agent to negotiate directly with employees violates the employer's duty to bargain collectively with the chosen representatives of his employees. *Medo Photo Supply Corp. v. NLRB*, 321 U.S. 678, 683, 64 S.Ct. 830, 88 L.Ed. 1007 (1944). The administrative law judge and the Board were justified in finding that the Company's actions constituted a bypass of the Marine Cooks, the exclusive representative of the Company's employees on the Queen Mary, and therefore violated the Act.

### (2) *The Pay Raise*

■ On March 7, 1973, the Company raised the wages of its employees unilaterally and without notice to the Marine Cooks. A unilateral change in condition of employment during negotiation violates § 8(a)(5), since it is a circumvention of the duty to negotiate. *NLRB v. Katz*, 369 U.S. 736, 743, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962). The Company seeks to exempt the raises by invoking language in *Katz* which suggests that a change pursuant to a longstanding practice is essentially "a mere continuation of the status quo" and so does not indicate an attempt to avoid bargaining with the union or to interfere with the collective bargaining process. *NLRB v. Katz*, 369 U.S. at 746, 82 S.Ct. at 1113.

The longstanding practice invoked here is that of the Company's corporate parent, Specialty Restaurants, Inc. (Specialty). Specialty claims a policy of paying the employees of its subsidiaries according to the wage scale of the local Culinary Workers

contract if the employees are not subject to a collective-bargaining agreement. The administrative law judge found that this "policy" resulted in a wage increase on the Queen Mary only once, but that increase was held to have been an unfair labor practice in the 1973 NLRB proceeding.[3] The record supports the finding that the "policy" was not firmly established for the Queen Mary. That the policy may have been longstanding for other bargaining units is immaterial. The longstanding-practice exception is based on the recognition that certain expected unilateral changes in the conditions of employment will not interfere with the collective-bargaining process because they represent the status quo. Because the pay raise was not a continuation of the status quo on the Queen Mary it falls within the reasoning of *Katz* since it interferes with collective bargaining as much as any other unilateral pay raise. The Board's finding of a violation of § 8(a)(5) is sustained.

### (3) *Refusal to Supply Requested Information*

■ The administrative law judge found that the Company had, without justification, delayed for four months in supplying the Marine Cooks with the Queen Mary's current health and welfare plan. He also found that it had delayed for five months in providing seniority information. These findings are amply supported by the record.

The information requested was relevant to the issues being negotiated, and the Company had an obligation to supply it promptly. Its failure to fulfill this obligation will support the Board's finding of refusal to bargain in good faith under Section 8(a)(5) of the Act. *Emeryville Research Center v. NLRB*, 441 F.2d 880 (9th Cir. 1971). *Accord, NLRB v. Acme Industrial Co.*, 385 U.S. 432, 87 S.Ct. 565, 17 L.Ed.2d 495 (1967); *NLRB v. Truitt Manu-*

---

**3.** In its briefs, the Company argues that there were actually two general wage increases in 1973, one in March and one in May. The former was the reflection of Specialty's longstanding policy and the latter was the subject of the unfair labor practice. Our review of the record convinces us that the administrative law judge was correct in finding that there was only one general wage increase and that it was held to have been an unfair labor practice.

*facturing Co.,* 351 U.S. 149, 76 S.Ct. 753, 100 L.Ed. 1027 (1956).

### B. *The Company's Justifications for its Bargaining Positions*

[7] The Board found additional evidence of the Company's refusal to bargain in good faith in its justifications for its refusal to compromise on the issues of union security and hiring hall. "Good-faith bargaining necessarily requires that claims made by either bargainer should be honest claims." *NLRB v. Truitt Mfg. Co.,* 351 U.S. at 152, 76 S.Ct. at 755. Patently improbable justifications for a bargaining position will support an inference that the position is not being maintained in good faith. By the same token, "adhering to an untenable legal position during the course of negotiations is inconsistent with the obligation to bargain in good faith." *Fraser & Johnston Co. v. NLRB,* 469 F.2d 1259 (9th Cir. 1972).

▮▮▮ The Company advanced three justifications for its refusal to compromise on the questions of union security and hiring hall. Two of these support an inference of bad faith. The first was that the Company represented those employees who had voted against the Marine Cooks and any compromise would betray them. This argument contradicts the basic tenet of collective bargaining: that a certified union is the exclusive representative of all the employees in the bargaining unit, including those who voted against the union and those who are not union members. See *Radio Officers' Union v. NLRB,* 347 U.S. 17, 46, 74 S.Ct. 323, 98 L.Ed. 455 (1954). The employer has a correlative duty to recognize the certified union as representing all the employees.

The good faith of its attempted justification is rendered even more dubious by the Company's rejection of a grandfather clause, offered as a compromise. Since a grandfather clause would "protect" those current employees who didn't wish to join the Marine Cooks, it should have met the Company's objection. However, the clause was rejected as being "the same as union-security."

The second reason the Company gave for its refusal to consider any form of union security or hiring hall was that it opposed both "as a matter of moral principle." The Board found this justification to be suspect in light of the labor policies of the company's parent, Specialty. Specialty owns five restaurants in Southern California whose employees are unionized. Four of these have contracts with locals of the Culinary Workers and each contract contains union-security and hiring-hall provisions. The fifth restaurant is the Queen Mary. In its previous contract with the Culinary Workers the Company had granted union security and a union hiring hall. The rejection as a "matter of principle" of a contract provision with a union will support an inference of bad-faith bargaining when the same provision is agreed to with another, favored union. *United Steelworkers v. NLRB,* 129 U.S.App.D.C. 80, 390 F.2d 846, *cert. denied,* 391 U.S. 904, 88 S.Ct. 1654, 20 L.Ed.2d 419 (1968).

The third justification for the Company's refusal to compromise was economic. The Company contended that it would be "economic suicide" to cut itself off from the pool of restaurant employees who were members of the Culinary Workers. Any form of union security or hiring-hall clause would entail such suicide, according to the Company.

At the Board hearing the Company sought to support its position by referring to the Marine Cooks' constitution which prohibits its members from belonging to a "dual" or competing organization. Members of the Culinary Workers would be unwilling to work on the Queen Mary if subject to a union-security clause, since to do so they would have to join the Marine Cooks. That in turn would require them to relinquish their membership in the Culinary Workers, since it would be a dual union under the Marine Cooks' constitution. As far as the record shows, no mention of the dual-union problem was made during the negotiations. The Company limited its argument to an assertion that granting any form of union security or hiring hall to the Marine Cooks would, in its business judg-

ment, mean economic suicide for the Queen Mary's restaurants.

The administrative law judge and the Board considered this justification "weak". The judge found that the Company selected its employees from applicants who either walked in off the street, were referred by other employees, or responded to newspaper advertising, and that it was not dependent on the Culinary Workers for its employees. He also found that there was no dual-unionism situation, since two thirds of the members of the Marine Cooks were also members of the Culinary Workers.

While the Board determined that the economic justification was not empirically valid, it did not find that it was advanced or held in bad faith. It was neither patently improbable nor illegal, and we discern no other basis for an inference that it demonstrated bad faith. The lack of demonstrated bad faith here, however, does not defeat the inferences of bad faith that were amply supported by the Company's other behavior.

### C. Other Evidence of Bad Faith

The final set of circumstances which led the Board to its finding of overall bad faith consisted of various actions of the Company during the negotiations. The administrative law judge characterized these as "evasive and dilatory tactics". On February 14, 1973, the Company's chief negotiator, John Nichols, misrepresented to the Marine Cooks that the Company could not set a date to continue negotiations because a certain lawyer was going over their proposals. In fact, the lawyer had nothing to do with the negotiations. On April 3, Nichols stated that he would produce a Company proposal on both hiring and union security, but he never did. On April 30, he stated that he would submit a hiring proposal. Again, none was forthcoming. On May 1, May 3, and May 9, he avoided the areas of union security and hiring hall, changing the subject when the Marine Cooks indicated its flexibility in those areas. On May 3, he stated in the negotiation session that he did not have authority to negotiate on union security and hiring hall.

On May 8, he told an official of the City of Long Beach that he was "willing to negotiate on all subjects." However, during the May 9 negotiating session he would not give any assurances that he was able or willing to negotiate on the questions of union security and hiring hall. He also would not respond to a new proposal on hiring made by the Marine Cooks.

This dissembling supports the finding that the Company was engaged in surface and bad-faith bargaining. The record as a whole, including the background evidence of the Company's antiunion animus, the independent violations of the duty to negotiate in good faith, and the illegal and patently improbable justifications given by the Company for its refusal to compromise, supports the NLRB's finding that the totality of the Company's conduct demonstrates a failure "to enter into discussion with an open and fair mind, and a sincere purpose to find a basis of agreement". *NLRB v. Holmes Tuttle Broadway Ford, Inc.,* 465 F.2d at 719, *quoting with approval from NLRB v. Herman Sausage Co.,* 275 F.2d 229, 231 (5th Cir. 1960). The Board's finding that the Company violated §§ 8(a)(5) and (1) by failing to bargain in good faith with the Marine Cooks is affirmed.

### III. COLLATERAL FINDINGS

The finding that the Company refused to bargain in good faith results in several collateral findings. First, it supports the finding that the strike was an unfair-labor-practice strike rather than an economic strike. If an unfair labor practice is a contributing cause of a strike, the strike, as a matter of law, is an unfair-labor-practice strike. *NLRB v. Columbia Tribune Publishing Co.,* 495 F.2d 1384 (8th Cir. 1974); *Southwestern Pipe, Inc. v. NLRB,* 444 F.2d 340 (5th Cir. 1971); *Larand Leisurelies, Inc. v. NLRB,* 523 F.2d 814 (6th Cir. 1975). Because the strike was an unfair-labor-practice strike and the strikers made unconditional offers to return to work, they are entitled to reinstatement as ordered by the Board. *See Mastro Plastics Corp. v. NLRB,* 350 U.S. 270, 278, 76 S.Ct.

349, 100 L.Ed. 309 (1956); *NLRB v. Ramona's Mexican Food Products, Inc.,* 531 F.2d 390, 395 (9th Cir. 1975).

■ Finally, the Board's finding that the Company's April 20 letter and May 26 telegram to its employees constituted threats violative of § 8(a)(1) of the Act must be sustained. Both communications informed the employees that if they struck or continued their strike they would be permanently replaced. The Company's statement of its rights was grossly inaccurate with respect to unfair-labor-practice strikes. Since the strike was an unfair-labor-practice strike and since the striking employees considered it such, the communications were a significant misrepresentation and constituted an unfair labor practice.

## IV. THE COMPANY'S DEFENSES

The Company attacks the NLRB's decision on several fronts. First, it adopts the reasoning of the dissenting Board member and focuses on the economic justification for its refusal to compromise on union security or hiring procedures. It argues that the Board's decision in effect forces it to make concessions on substantive contract terms, thus violating the dictates of *H.K. Porter Co. v. NLRB,* 397 U.S. 99, 106, 90 S.Ct. 821, 25 L.Ed.2d 146 (1970).

■ In *H.K. Porter* the Supreme Court did not question the validity of the Board's finding that the employer had not bargained in good faith. It ruled only on the propriety of the NLRB's order, which required the company to concede on the specific issue of dues check-off. 397 U.S. at 109, 90 S.Ct. 821. (Harlan J. concurring). Since the Board's order in this case did not require any specific concessions and since the Company is challenging the finding rather than the order, *H.K. Porter* is, strictly speaking, inapposite. However, a corollary principle has evolved from that case which prohibits a finding of bad faith bargaining based on "the mere fact that * * [a party] adamantly insists on a bargaining position or has not budged from its position on most issues". *Wal-Lite Division of United States Gypsum Co. v. NLRB,* 484 F.2d

108, 111 (8th Cir. 1973); *NLRB v. MacMillan Ring-Free Oil Co.,* 394 F.2d 26, 29 (9th Cir.), *cert. denied,* 393 U.S. 914, 89 S.Ct. 237, 21 L.Ed.2d 199 (1968). It is this principle the Company invokes here.

The Company's attack misses its mark. A precondition to application of the *Wal-Lite* principle is the lack of other "substantial evidence that a negotiating party's attitude is inconsistent with its duty to seek an agreement". *Wal-Lite,* 484 F.2d at 111. While the Company concentrates on the Board's rejection of its economic justification, it ignores all the other evidence of its bad faith in the negotiating process. This evidence is substantial. The Company's uncompromising attitude was found to be another manifestation of its refusal to bargain in good faith. The other evidence of its refusal to bargain renders *H.K. Porter* and its progeny inapplicable.

■ The Company next contends that the Board's order is unenforceable because the Company was denied due process on two occasions during the hearing. The first of these alleged denials was the rejection of certain evidence which the Company claimed would justify its agreeing to union-security and hiring-hall provisions in its earlier contract with the Culinary Workers. The evidence was offered in rebuttal to the General Counsel's proof that the "moral principle" justification for the Company's refusal to compromise was offered in bad faith. Although the offer of proof is not entirely clear, the Company appears to be arguing that it was forced to compromise its moral principles and accept union-security and hiring-hall clauses because the Culinary Workers were capable of closing down the Queen Mary in the event of a strike. The presence of the provisions does not negate the Company's moral opposition to them; it indicates the Culinary Worker's superior economic power.

The evidence is relevant for this purpose, and it was error to exclude it. However, we do not find the error prejudicial. The most this evidence could have shown would have been that the existence of union-secur-

ity and hiring-hall provisions in the earlier Queen Mary contract did not support the Board's finding that the Company's moral-principle justification was offered in bad faith. That finding is still supported by the substantial, unrebutted evidence of the other contracts signed by Specialty's subsidiaries which contain union-security and hiring-hall provisions. The error did not affect the substantial rights of the parties. It does not constitute a violation of due process.

■ The second alleged deprivation of due process was the rejection of an offer of proof that the Marine Cooks and the Culinary Workers were "dual unions" within the meaning of the Marine Cooks' constitution. This evidence was offered in support of the Company's economic justification for its refusal to compromise. The validity of the economic justification was at most marginally relevant to the question of the Company's bad faith. Moreover, the evidence that the unions were competing was to be elicited from the chief negotiator of the Marine Cooks. His testimony elsewhere indicates that he did not in fact believe that the Culinary Workers was a dual union, and thereby renders the offer suspect. In any event, the exclusion of marginally relevant evidence is no denial of due process.

The Company makes two further arguments which require only brief response. First, it argues that its good faith cannot be measured because the Marine Cooks bargained in bad faith. The record provides no evidence of bad faith on the union's part, and the administrative law judge found none. Second, the Company argues that the Marine Cooks cannot invoke the remedial machinery of the NLRB because it discriminates against females.[4] Again, the administrative law judge found the evidence of a pattern of discriminatory conduct to be insufficient, and the record supports this finding.

Enforcement granted.

4. This argument derives from *NLRB v. Mansion House Center Management Corp.*, 473 F.2d 471 (8th Cir. 1973). We do not here decide its applicability to the circumstances of this case.