**GRAPHIC ARTS INTERNATIONAL UNION, LOCAL NO. 280, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 78–1950.

United States Court of Appeals, Ninth Circuit.

May 14, 1979.

David A. Rosenfeld, San Francisco, Cal., for petitioner.

Walter C. Schumann, Washington, D. C., for respondent.

Before CHOY and SNEED, Circuit Judges, and INGRAM,* District Judge.

CHOY, Circuit Judge:

Graphic Arts International Union, Local 280 (Union or Local 280) petitions for review of a decision and order of the National Labor Relations Board (the Board) finding that the Union had violated the National Labor Relations Act (NLRA or Act) and imposing sanctions. The Board cross-applies for enforcement of its order. We enforce.

I. *Statement of the Case*

Local 280 represents certain workers in the lithograph industry. Prior to the negotiations here in question, it had been the

---

* The Honorable William A. Ingram, United States District Judge for the Northern District of California, sitting by designation.

practice in this industry for a multi-employer bargaining association known as the Printing Industries of Northern California (PINC) to negotiate with Local 280. Independent employers in the industry who were not members of PINC summarily agreed to the terms established by the Local 280-PINC negotiations, often before those negotiations were completed.

In 1975, the Union broke with this practice. Making little progress in its negotiations with PINC, the Union began individualized negotiations with the independent employers, even though the independents indicated their continued willingness to adhere to the previous practice. The Union formulated a proposed contract and mailed it to the independents on May 16, 1975, asking the independents to sign and return the proposed contract by May 20, 1975. The "vast majority" of independents did so. Ten independents, however, sought to discuss the proposed contract with the Union and make modifications to it. Nonetheless, they "eventually signed contracts, which, with isolated exceptions . . . , matched [the Union's] proposed contract in all details." The Board later determined that Local 280 failed to bargain in good faith with these ten employers, in violation of § 8(b)(3) of the Act, 29 U.S.C. § 158(b)(3).[1]

An eleventh employer, Color Tech. Corp. (Color Tech), had been a member of PINC prior to the 1975 negotiations. During those negotiations, Local 280 imposed a ban on overtime work by its members at Color Tech. Told by Union leaders that the ban would be lifted if Color Tech left PINC, the president of Color Tech soon pulled it out of PINC.[2] Shortly thereafter, Color Tech and Local 280 signed an individual collective bargaining agreement. Reviewing the events, the Board concluded that Local 280 imposed the overtime ban with the purpose of inducing Color Tech to leave PINC and bargain individually with the Union. The Board held that this conduct constituted the unfair labor practice of seeking to determine who would represent Color Tech in bargaining, in violation of § 8(b)(1)(B)[3] and (b)(3) of the Act, 29 U.S.C. § 158(b)(1)(B) & (b)(3).

The Union seeks review of these findings of unfair labor practices and the sanctions imposed by the Board.[4]

## II. Substantial Evidence for the Board's Findings

### A. Failure to Bargain in Good Faith

Local 280 argues that the Board's findings that it did not bargain in good faith with the ten independent employers are not supported by the properly considered evidence.

### 1. Board's Drawing of Inferences

The Board found that the evidence showed, inter alia, that Local 280 unfairly treated with the independents, took an intransigent, insincere, and cavalier attitude toward the negotiations, and improperly employed economic power to thwart negotiations. While the Board inferred from the evidence a lack of good faith on the part of the Union, Local 280 contends that the evidence manifests only that it strenuously bargained for its proposals and had the economic clout to back up its demands.

---

1. Section 8(b)(3) provides in relevant part:
 It shall be an unfair labor practice for a labor organization or its agents—

 . . .

 (3) to refuse to bargain collectively with an employer . . . .

2. Color Tech remained in PINC as it related to functions other than the multi-employer bargaining unit.

3. Section 8(b)(1)(B) provides in relevant part: It shall be an unfair labor practice for a labor organization or its agents—

 (1) to restrain or coerce . . . an employer in the selection of his representatives for the purposes of collective bargaining

 . . . .

4. The Board and Administrative Law Judge rejected the General Counsel's claim that the Union also violated § 8(b)(3) by refusing to execute a contract with another employer because that employer had filed unfair labor practice charges with the Board. This ruling is not on appeal.

In *Queen Mary Restaurants Corp. v. NLRB*, 560 F.2d 403 (9th Cir. 1977), this court noted that in reviewing the Board's finding of an employer's lack of good faith in bargaining, "we must affirm the Board's decision on the facts if it is supported by substantial evidence on the record considered as a whole." *Id.* at 407; *see Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). We continued:

> The question whether an employer's conduct demonstrates an unwillingness to bargain in good faith or is merely hard bargaining often forces the trier to draw difficult inferences from conduct to motivation. Since the accuracy of such inferences depends in part on an understanding of the collective-bargaining process, "the Board has been afforded flexibility to determine * * * whether a party's conduct at the bargaining table evidences a real desire to come into agreement." [Citation omitted.] . . . [A] court will not lightly disregard the over-all appraisal of the situation by the Labor Board as one of those agencies presumably equipped or informed by experience to deal with a specialized field of knowledge. [Citation omitted.]

> Our recognition of the Board's expertise also tends to limit our review of the inferences it chooses to draw. "If facts are open to conflicting inferences, we are not at liberty to draw an inference different from the one drawn by the Board, even though it may seem more plausible and reasonable to us."

560 F.2d at 407; *see NLRB v. Hospital & Institutional Workers Union*, 577 F.2d 649, 652 (9th Cir. 1978); *NLRB v. Millmen*, 367 F.2d 953, 956 (9th Cir. 1966).

■ Having carefully reviewed the record, we believe that the Board's inferences of the Union's failure to bargain in good faith rest upon a reasonable reading of all the evidence. Accordingly, we must affirm the Board's conclusions and may not reevaluate the evidence as the Union suggests.

### 2. *Reliance on Improper Evidence*

Local 280 argues that certain evidence was impermissibly considered by the Board and that without that evidence, substantial evidence would not support the Board's findings of the Union's failure to bargain in good faith with the independents.

■ Local 280 contends first that the Board's consideration of the Union's intransigence in bargaining was improper. The Union argues that such consideration penalized the Union for seeking certain contractual provisions and contravened the rule that the Board may not require the parties to agree to particular contractual terms. But as the Fifth Circuit has noted:

> By detecting a lack of good faith in [a party's] conduct, the Board is not . . . indirectly attempting to impose actual terms on the parties [citation omitted], nor is the Board seeking to interdict merely a particularly vigorous instance of hard bargaining. [A party] can properly insist, and adamantly so, on a bargaining position without contravening statutory requirements. [Citation omitted.] But there comes a point when hard bargaining ends and obstructionist intransigence begins.

*NLRB v. Big Three Industries*, 497 F.2d 43, 47 (5th Cir. 1974); *see Queen Mary Restaurants*, 560 F.2d at 407, 411.[5] The Board's

---

5. In *Queen Mary* we wrote:

> The Company . . . argues that the Board's decision in effect forces it to make concessions on substantive contract terms, thus violating the dictates of *H. K. Porter Co. v. NLRB*, 397 U.S. 99, 106, 90 S.Ct. 821, 25 L.Ed.2d 146 (1970).

> In *H. K. Porter* the Supreme Court did not question the validity of the Board's finding that the employer had not bargained in good faith. It ruled only on the propriety of the

NLRB's order, which required the company to concede on the specific issue of dues check-off. [Citation omitted.] Since the Board's order in this case did not require any specific concessions and since the Company is challenging the finding [of a refusal to bargain in good faith] rather than the order, *H. K. Porter* is, strictly speaking, inapposite. However, a corollary principal has evolved from that case which prohibits a finding of bad faith bargaining based on "the mere fact

findings that Local 280 crossed that point here are supported by substantial evidence in the record as a whole.

■ The Union also argues that the Board erred by evaluating the good faith of its bargaining *vis-a-vis* some of the independents based in part upon the Union's conduct as to other of the independents. But the Board correctly notes:

> The Union's . . . objection to this approach ignores the established principle that in determining whether a party has bargained in good faith the Board and the courts must "look at the sum of the evidence, not merely pieces . . . ." *N. L. R. B. v. Tomco Communications, Inc.,* 567 F.2d 871, 883 (C.A.9, 1978). "A state of mind such as good faith is not determined by the consideration of events viewed separately. The picture is created by a consideration of all the facts viewed as an integrated whole." *N. L. R. B. v. Stanislaus Implement & Hardware Co.,* 226 F.2d 377, 381 (C.A.9, 1955). Accord: *N. L. R. B. v. Dent,* 534 F.2d 844, 846 (C.A.9, 1976). This is particularly true here because the Union's treatment of each of the employers was, as the Union concedes, the result of a determination to impose the same treatment on all of the employers.

In short, substantial evidence which could properly be considered by the Board supports its findings of lack of good faith bargaining on the part of Local 280.

### B. *Finding of Attempted Coercion of Color Tech*

The Board held that the Union had committed the unfair labor practice of seeking to determine who would represent Color Tech in bargaining, in violation of § 8(b)(1)(B) and (b)(3) of the Act. The Board found that the Union had imposed a ban on its members' working overtime at Color Tech with the purpose and effect of inducing Color Tech to pull out of PINC and bargain individually with the Union.

Local 280 argues that there was testimony by its officers, contrary to the testimony of officials of Color Tech, which if believed, would establish that the ban on overtime was not imposed in order to induce Color Tech to pull out of PINC. The Administrative Law Judge and Board, however, credited the testimony of the Color Tech officials, and we may not disregard that crediting unless "the credibility determinations conflict with the clear preponderance of the evidence [citation omitted], or where they are 'inherently incredible or patently unreasonable.'" *Hospital & Institutional Workers Union,* 577 F.2d at 652; *see NLRB v. Ayer Lar Sanitarium,* 436 F.2d 45, 49 (9th Cir. 1970). The Union has not shown any of these circumstances that warrant substitution of our determinations of credibility.

■ Local 280 also asserts that one can view the evidence as showing that Local 280 did not intend to encourage Color Tech to leave PINC and that its leaving PINC resulted from its own initiative. However, because the Board's inference is reasonable and supported by the evidence, we may not reevaluate the evidence to draw our own inference. *See Hospital & Institutional Workers Union,* 577 F.2d at 652; *Queen Mary Restaurants,* 560 F.2d at 407; *Millmen,* 367 F.2d at 956. In sum, substantial evidence supports the Board's finding that Local 280 committed the unfair labor prac-

that [a party] adamantly insists on a bargaining position or has not budged from its position on most issues." [Citations omitted.] It is this principle the Company invokes here.

The Company's attack misses its mark. A precondition to application of the [corollary] principle is the lack of other "substantial evidence that a negotiating party's attitude is inconsistent with its duty to seek an agreement". [Citation omitted.] While the Company concentrates on the Board's rejection of its economic justification, it ignores all the other evidence of its bad faith in the negotiat-

ing process. This evidence is substantial. The Company's uncompromising attitude was found to be another manifestation of its refusal to bargain in good faith. The other evidence of its refusal to bargain renders *H. K. Porter* and its progeny inapplicable.
560 F.2d at 411; *see NLRB v. Pacific Grinding Wheel Co.,* 572 F.2d 1343, 1348 (9th Cir. 1978). Here too the Administrative Law Judge's opinion, adopted in relevant part by the Board, was replete with other evidence, unrelated to the Union's intransigence, manifesting the refusals to bargain in good faith.

tice of seeking to determine who would represent Color Tech in bargaining.

### III. *Make Whole Remedy for Color Tech*

The Administrative Law Judge ordered the Union, *inter alia*, to "hold harmless" Color Tech and its employees "from any disparities between the labor contract [the Union] signed with Color Tech in May 1975, and the collective bargaining agreement [the Union] concluded with [PINC] in July 1975." In modifying that portion of the order, the Board wrote:

We have decided to modify the remedy to conform with that given by the Board in analogous circumstances in *Warehousemen's Union Local 17, International Longshoremen's & Warehousemen's Union*, 182 NLRB 781 (1970), enfd. 451 F.2d 1240 (C.A.9, 1971), and we shall therefore require [the Union] only to make Color Tech whole for any financial expenditures made pursuant to the May 1975 labor agreement, which it would not have been obligated to make under the July 1975 P.I.N.C. contract.

Local 280 takes exception to this part of the order as modified.[6]

Local 280 argues first that in some cases similar to the present one, the Board has not imposed such a make-whole remedy. It concludes that the remedy was therefore inappropriate here.

■■ The Board has broad discretion in fashioning remedies to effectuate the policies of the NLRA in light of the circumstances of each case. *NLRB v. Retail Clerks Local 588*, 587 F.2d 984, 988 (9th Cir. 1978); *Alfred M. Lewis, Inc. v. NLRB*, 587 F.2d 403, 412 (9th Cir. 1978); *NLRB v. International Longshoremen's & Warehousemen's Union*, 549 F.2d 1346, 1355 (9th Cir.), *cert. denied*, 434 U.S. 922, 98 S.Ct. 397, 54 L.Ed.2d 279 (1977). Here the Board explicitly structured its remedy in accordance with our decision in *NLRB v. Warehousemen's Union Local 17*, 451 F.2d 1240, 1243 (9th Cir. 1971). There we found that substantial evidence supported the Board's

finding that the union had refused to sign a contract which embodied a previous agreement reached by the parties and instead sought to force the employer to sign a different contract. We upheld the Board's ordering the union to make whole the employer for any differences in expense between the second, improper contract and the first agreement. We wrote:

If a party who unlawfully refuses to bargain is permitted to retain the fruits of unlawful action, the Act is rendered meaningless, and defiance of the board's orders is encouraged.

. . . The board's order awarding compensatory damages to the company was a reasonable exercise of the board's Section 10(c) power to make whole the victim of an unfair labor practice.

*Id.* at 1243. The Board acted within its discretion in imposing a similar sanction here. *See NLRB v. Strong*, 393 U.S. 357, 362, 89 S.Ct. 541, 21 L.Ed.2d 546 (1969).

Local 280 argues next that the Board's remedy provides Color Tech with an unjustified windfall. The Union notes that PINC members engaged in a lock-out of Union members prior to securing the Local 280-PINC contract. Color Tech, which at the time had left PINC, did not lock-out. Therefore, the Union argues, Color Tech will receive the benefits of the PINC negotiations without incurring the economic costs of a lock-out borne by PINC members.

Any such windfall, however, derives from Local 280's unlawful inducing of Color Tech to withdraw from PINC. To reject a make-whole remedy because of this possible windfall would mean allowing the Union to benefit from its unlawful conduct by escaping an appropriate remedy. We do not believe that the Board abused its discretion in refusing to allow Local 280 to so benefit. *See Warehousemen's Union Local 17*, 451 F.2d at 1243.

■ Finally, the Union claims that while under the order it must reimburse Color Tech when the individual agreement is more expensive than the PINC contract,

---

6. Local 280 does not otherwise object to the nature of the remedies imposed by the Board.

there is no provision for the Union to receive a set-off when the individual agreement is less costly to Color Tech. Without determining if disallowance of a set-off would contravene the Board's authority, it is sufficient to note that the Board acknowledges that "[a]ll Board make-whole remedies are governed by the mitigation of damages principle . . . and nothing in the general terms of the Board's order here precludes the Union from availing itself of that principle in post-enforcement compliance procedures before the Board." In sum, we conclude that the Board acted well within its discretion in imposing the make-whole remedy as to Color Tech.

## IV. *Defense of Discrimination*

At the hearing before the ALJ regarding the alleged failure to bargain in good faith, Local 280 sought to introduce evidence that some of the employers discriminated against certain minority groups. Local 280 argued that the employers' discrimination constituted a defense to the charge that the Union did not bargain in good faith. The ALJ refused to admit the evidence, holding that such discrimination would not constitute a defense to the charge. The Board agreed.

The Union renews its contention that an employer's discrimination constitutes a defense to a charge that a union has not bargained with that employer in good faith. The Union makes three claims: (1) a Board order requiring bargaining with a discriminating employer fosters discrimination; (2) such fostering of discrimination violates the Constitution; and (3) refusing to require bargaining with a discriminating employer would constitute a powerful incentive to ending discrimination.

### A. *Fostering of Discrimination*

■ Local 280 argues that the Board's requiring it to bargain with a discrimina-

ting employer fosters and encourages that employer to discriminate. Given the facts of this case, we disagree.[7]

Local 280 does not claim that it refused to bargain in good faith as a protest against employer discrimination. In fact, Local 280 was perfectly willing to deal with the independents—discrimination or not—as long as they accepted the terms "proposed" by the Union. Only when the employers refused to capitulate did the Union refuse to bargain in good faith. And only when charged with an unfair labor practice did the Union assert the defense of discrimination. Thus, it cannot be said that the Board's bargaining order undermined a concerted Union effort to eliminate discrimination.

■ Moreover, the Board's order does not require—or even allow—the parties to discuss proposals to discriminate. The Board has held that a union has an obligation under the duty of fair representation as well as under civil rights statutes to avoid discrimination. The Board has also held that an employer's insistence upon contract terms that would contravene the union's responsibility can constitute an unfair labor practice. *Southwestern Pipe, Inc.*, 179 NLRB 364, *modified* 444 F.2d 340 (5th Cir. 1971).[8] Similarly, a party cannot lawfully demand an illegal contractual provision. *See NLRB v. General Motors Corp.*, 373 U.S. 734, 735, 83 S.Ct. 1453, 10 L.Ed.2d 670 (1963). Thus, the bargaining order cannot result in the Union's having to discuss ways to discriminate or other unlawful matters.

■ Additionally, both the Supreme Court and the Board have held that "[t]he elimination of discrimination and its vestiges is an appropriate subject of bargaining . . . ." *Emporium Capwell Co. v. Western Addition Community Association*, 420 U.S. 50, 69, 95 S.Ct. 977, 43 L.Ed.2d 12 (1975); *see Westinghouse Electric Corp.*, [1978–79] CCH NLRB ¶ 15,191, at 28,437.

---

7. We assume *arguendo* that the Union's evidence would have shown that the employers, or some of them, discriminated against some minority groups and women in violation of law.

8. The Fifth Circuit determined that substantial evidence did not support the Board's finding

that the employer had improperly tried to "stymie" the anti-discrimination effort of the union. 444 F.2d at 347–48. The Fifth Circuit, however, did not reject the Board's view that such an attempt would constitute an unfair labor practice.

And the Board has found that an employer's failure to bargain in good faith about eliminating discrimination can constitute an unfair labor practice. *Farmer's Cooperative Compress*, 169 NLRB 290 (1968), *enforced sub nom. United Packinghouse, Food & Allied Workers International Union v. NRLB*, 135 U.S.App.D.C. 111, 416 F.2d 1126, *cert. denied*, 396 U.S. 903, 90 S.Ct. 216, 24 L.Ed.2d 179 (1969).[9] Thus, the Board's bargaining order may become the occasion for, rather than an obstacle to, discussions and other efforts to eliminate discrimination.

### B. *Government Imprimatur on Employers' Discrimination*

Local 280 argues that by ordering it to bargain in good faith with the employers, the Government sponsors and places its approval upon the employers' discrimination in violation of the equal protection component of the fifth amendment due process clause. *See Bolling v. Sharpe*, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954).

■ It is clear that the Government's provision of a nondiscriminatory benefit to a discriminating private individual, such as requiring the Union to bargain with a discriminating employer, does not automatically make the Government a party to the discrimination in violation of equal protection guarantees. In *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972), the Supreme Court wrote:

9. The District of Columbia Circuit enforced this portion of the Board's order, finding that "[t]he record fully supports the Board's order" that the company "bargain in good faith with the union over racially discriminatory practices." 135 U.S.App.D.C. at 118, 416 F.2d at 1133. The court also held that under some circumstances, discrimination in and of itself can be an unfair labor practice. *Id.* at 120, 416 F.2d at 1135.

10. *See* part IV A *supra.*

11. Local 280 refers to decisions discussing whether the Board violates the equal protection guarantee when it certifies a discriminating union and orders an employer to bargain with that union: *NRLB v. Sumter Plywood Corp.*, 535 F.2d 917 (5th Cir. 1976), *cert. denied*, 429 U.S. 1092, 97 S.Ct. 1105, 51 L.Ed.2d 538 (1977); *NLRB v. Mansion House Center Management Corp.*, 473 F.2d 471 (8th Cir. 1973).

The Court has never held, of course, that discrimination by an otherwise private entity would be violative of the Equal Protection Clause if the private entity receives any sort of benefit or service at all from the State, or if it is subject to state regulation in any degree whatever. . . . Our holdings indicate that where the impetus for the discrimination is private, the State must have "significantly involved itself with invidious discriminations," [citation omitted], in order for the discriminatory action to fall within the ambit of the constitutional prohibition.

*Id.* at 173, 92 S.Ct. at 1971; *see Jackson v. American Bar Association*, 538 F.2d 829, 832–33 (9th Cir. 1976); *Powe v. Miles*, 407 F.2d 73, 81 (2d Cir. 1968).

As noted *supra*,[10] the Board's bargaining order does not involve the Board with the employer's discrimination because the employer cannot lawfully bargain to create or continue unlawful discrimination. Indeed, if the Board's bargaining order has any impact upon the employer's discrimination, it is to place the Union and the employer at the bargaining table where the Union can present proposals to eliminate discrimination, thereby obligating the employer to bargain in good faith about such proposals. In short, the Board's order does not involve the Government with the employer's discrimination in violation of the Constitution.[11]

In *Mansion House* the Eighth Circuit held that the Board could not require an employer to bargain with a discriminating union. The court noted that unions certified as the bargaining representative of a group of employees gain numerous legal benefits making membership in such a union sometimes necessary to gain employment. The court wrote:

We conclude that the claim of racial discrimination allegedly practiced by a union seeking recognition as a representative bargaining unit under the Act is a relevant area of inquiry for the Board when the defense is appropriately raised before the Board upon a company's refusal to bargain.

473 F.2d at 474. The court continued:

[W]e hold the remedial machinery of the National Labor Relations Act cannot be available to a union which is unwilling to correct

## C. Incentive to Eliminate Discrimination

 Local 280 argues lastly that if discriminating employers could not receive the benefits of the NLRA, such as a bargaining order directed against a union, then such employers would have a powerful incentive to end discrimination. The Union concludes that it should be allowed to raise the defense of discrimination to create this incentive.

We believe that the Union's factual assumption is seriously flawed. As discussed *supra*, requiring negotiations provides the opportunity for the Union to raise the issue of ending discrimination. But if negotiations break down, as here, and the Board does not order bargaining, then there may be no opportunity to bargain about ending discrimination. Thus the Union's approach would detract from both the policy in favor of ending discrimination and the policy in favor of peaceful resolution of labor-management disputes. See *Emporium Capwell Co.*, 420 U.S. at 68–69, 95 S.Ct. 977.

Moreover, the Union's approach might actually discourage unions from promptly raising in negotiations claims of discrimination. A union might determine to save the discrimination issue as a defense in case of an unfair labor practice charge rather than raise the issue when the union first learns of possible discrimination.

Additionally, acceptance of the Union's position would cheapen the war against dis-

past practices of racial discrimination. Federal complicity through recognition of a discriminating union serves not only to condone the discrimination, but in effect legitimates and perpetuates such invidious practices.

*Id.* at 477. In *Sumter Plywood* the Fifth Circuit adopted a similar view, writing:

The analytic basis for *Mansion House* . . . is the notion that the enforcement mechanisms of the Board and the courts could not, consistent with constitutional requirements of equal protection, be made available to racially discriminatory unions. As this Court stated . . .

Indeed, the Supreme Court has indicated that any statute purporting to bestow upon a union the exclusive right to represent all employees would be unconstitutional if it failed to impose upon the union this reciprocal duty of fair representation.

[Citations omitted.]

The same considerations giving rise to the union's duty of fair representation support the . . . *Mansion House* procedures whereby the Board is to consider . . . whether a union has shown such a "propensity to fail fairly to represent employees," because of racial discrimination, that the union should not be certified.

535 F.2d at 930. The court added that since aggrieved individuals have an independent Title VII claim, the Board should refuse certification because of discrimination "only when the employer has proffered specific evidence sufficient to demonstrate a pattern of racially discriminatory behavior by the Union which would support a finding of a definite propensity for racially unfair representation." *Id.* at 931. The court then held that the employer's evidence of discrimination against whites did not suffice under this test, particularly in view of the societal interest in improving the traditional disadvantage of blacks. The court therefore enforced the Board's order notwithstanding the evidence of discrimination. *Id.* at 932

The rationale of *Mansion House* and *Sumter Plywood* does not apply to the instant case. In those cases, a union sought certification and bargaining orders as the exclusive representative of the concerned employees. Because this exclusive capacity may be conferred only upon unions that adequately represent the interests of the employees, the Board's certification of a discriminatory union would suggest that the Board did not consider discrimination against minorities to be a major concern, contrary to established national policy. See *Emporium Capwell Co.*, 420 U.S. at 61–65, 95 S.Ct. 977. Moreover, because the union becomes the exclusive representative of the employees, those minority employees not adequately represented would be deprived of representation at the hands of the Board. See *id.* Thus, in the Eighth Circuit's words, the Board's certification and bargaining order in effect legitimate and perpetuate such invidious practices. 473 F.2d at 477.

By contrast, the employer has no duty of fair representation toward employees and the Board does not grant an employer power akin to exclusive representation at the expense of individual representation. Thus, the factors considered critical by the Eighth and Fifth Circuits are not implicated by the Board's ordering the union to bargain about nondiscriminatory matters. In short, even were we to embrace their holdings in a proper case, *Mansion House* and *Sumter Plywood* do not require a result different from that we reach today. See *Polynesian Cultural Center, Inc. v. NLRB*, 582 F.2d 467, 477 n. 5 (9th Cir. 1978); *Natter Mfg. Corp. v. NLRB*, 530 F.2d 948, 951–52 n. 2 (9th Cir. 1978); *Queen Mary Restaurants Corp. v. NLRB*, 560 F.2d 403, 412 n. 4 (9th Cir. 1977); compare *Bell & Howell Co. v. NLRB*, —— U.S.App.D.C. ——, 598 F.2d 136 (1979).

**914**

crimination. Here the Union was completely willing to deal with the employers as long as they accepted the Union's proposals. Only when the employers sought to avail themselves of the NLRA's provisions for good faith bargaining did the Union refuse to deal in good faith. The Union has thus taken the position that it will cooperate with discriminators when it gains its way, but oppose discrimination when to do so may foster the Union's bargaining strength. We do not believe that the Constitution or the national policy against discrimination requires the Board or this court to approve such philosophism.

■ Finally, even if Local 280 is correct in saying that its approach would assist in ending discrimination, it would be an inappropriate exploitation of the Board. The Supreme Court has instructed that while the Board must prevent discrimination as it impinges on the NLRA, the EEOC and not the Board has the primary responsibility for enforcing the Civil Rights Acts. The Court has also indicated that the courts are not free to give the Board that preeminent role even if it would be efficacious in ending discrimination. *Emporium Capwell Co.*, 420 U.S. at 71–73, 95 S.Ct. 977. Here the Board's function is, *inter alia*, to enforce the duty to bargain in good faith, including the duty to bargain in good faith about an end to discrimination if properly raised in negotiations. That mandate cannot warrant use of the Board's coercive power in the manner urged by the Union, notwithstanding the laudable end allegedly to be served.

ENFORCED.