Filed 1/26/26

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| TRUSTEES OF THE CALIFORNIA STATE UNIVERSITY,<br><br>    Petitioners,<br><br>    v.<br><br>PUBLIC EMPLOYMENT RELATIONS BOARD,<br><br>    Respondent;<br><br>CALIFORNIA FACULTY ASSOCIATION,<br><br>    Real Party in Interest. | B340818<br><br>(Public Employment Relations Board Decision No. 2915-H, Case No. SA-CE-422-H) |

ORIGINAL PROCEEDING; petition for writ of review. Decision affirmed in part and vacated in part.

Sloan Sakai Yeung & Wong, Jeff Sloan and Justin Otto Sceva for Petitioner.

Public Employment Relations Board, J. Felix De La Torre, Mary Weiss, Joseph W. Eckhart, Jeremy G. Zeitlin and Andrew Z. Gordon for Respondent.

Rothner, Segall & Greenstone, Julia Harumi Mass and Laura Carver for Real Party in Interest.

———————————

The present action was brought under the Higher Education Employer-Employee Relations Act (HEERA) (Gov. Code,[1] §§ 3560 et seq.), which governs labor relations between public institutions of higher education and their employees.  This writ proceeding comes to this court from the Public Employment Relations Board (PERB), an independent administrative agency charged with administering HEERA and other public sector labor laws.  PERB has original jurisdiction to decide unfair labor practices charges (§ 3563.2), and review of PERB decisions is by petition for writ of review in the Court of Appeal (§ 3509.5).

The California Faculty Association (CFA) is the bargaining unit that represents professors, lecturers, coaches, counselors, and librarians of the California State University (CSU).  In early 2023, CSU adopted an executive order that changed its student vaccination requirements effective in fall 2023.  CFA demanded to bargain over the change; CSU responded that it was not required to bargain, but was willing to meet to discuss it.  CFA declined the offer to meet and filed an unfair practices charge.

After a hearing, an administrative law judge (ALJ) determined that CSU was required to bargain over reasonably foreseeable effects of the new student vaccination requirements

_____

[1]    Subsequent undesignated statutory references are to the Government Code.

2

on faculty health, and that CSU violated HEERA by implementing the new requirements without bargaining.  On review, PERB largely affirmed the ALJ's findings, concluding that CSU had a duty to bargain and had implemented the new student vaccine requirements without engaging in bargaining.  CSU sought a writ of review from that decision.

As we discuss, PERB did not err by finding that CSU has a duty to bargain over the effects of its revised student vaccine policy.  However, there is no substantial evidence in the administrative record that when CFA filed its unfair practice charge, CSU had implemented the revised policy or had definitively refused to bargain.  Accordingly, we set aside PERB's finding that CSU violated HEERA and remand the matter for the parties to engage in effects bargaining.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.     CSU's student vaccination policies.

In 1985, the CSU began requiring new students born after 1956 to show proof of immunization for measles and rubella.  Effective fall 2002, new students 18 years or younger were also required to show proof of immunization for hepatitis B.  Exemptions were permitted based on medical conditions and religious or personal beliefs.  Students could satisfy the requirement by showing that they had enrolled in a California public school for the seventh grade or higher after June 1999.

In March 2019, the CSU significantly revised its vaccination policy (the 2019 policy) to require all students to be vaccinated for measles, mumps, rubella, hepatitis B, varicella (chickenpox), tetanus-diphtheria-pertussis, and meningococcal disease, and to be screened for tuberculosis.  Under the 2019

3

policy, exemptions were allowed for medical reasons, but not for religious or personal beliefs.

The 2019 policy was to have been implemented in fall 2020, but it was delayed due to the COVID-19 pandemic. In July 2021, the CSU announced a "soft" implementation date of fall 2022, and a "hard" implementation date of fall 2023. Ultimately, however, the 2019 policy was not implemented because the CSU revised its vaccination policy on February 14, 2023[2] through Executive Order 803, which required only that students under age 19 be vaccinated against hepatitis B (the 2023 policy). All other vaccinations and screenings required by the 2019 policy were recommended but not required by the 2023 policy, and exemptions were permitted based on medical conditions and religious beliefs. The 2023 policy applied to all students entering CSU "in or after fall 2023."

## II. CFA's demand to bargain.

CSU and CFA are parties to a collective bargaining agreement that sets forth the terms and conditions of faculty members' employment. Under HEERA, CSU and CFA have a duty to bargain in good faith over matters within the "scope of representation" (§ 3570)—that is, over "wages, hours of employment, and other terms and conditions of employment" (§ 3562, subd. (r)(1)). The CSU also is required to bargain over policy changes that fall outside the scope of representation but have reasonably foreseeable "effects" on issues within the scope of representation. (*International Assn. of Fire Fighters, Local 188, AFL-CIO v. Public Employment Relations Bd.* (2011) 51 Cal.4th

---

[2]     Unless otherwise noted, further unspecified dates refer to calendar year 2023.

4

259, 276–277 (*Fire Fighters*).)  The first category is sometimes referred to as "decision bargaining," and the latter category as "effects bargaining."

CSU did not formally notify the CFA that it had adopted the 2023 policy, but the CFA learned of it within two weeks of its adoption.  On February 23, Kathy Sheffield, CFA's Director of Representation and Bargaining, sent a letter to Stefanie Gusha, CSU's Senior Director of Collective Bargaining, demanding to bargain over the 2023 policy.  Sheffield's letter said:

"We have recently learned of a change to mandatory immunization policy for CSU students.  [¶]  It appears that planning and implementation are proceeding without regard to the Collective Bargaining Agreement or our rights under HEERA.  We were never notified of this policy or invited to meet and confer on it.  Please cease implementation until we have had time to meet and confer over this policy change, which requires rescinding the policy until the union has had the opportunity to meet and confer on impact.  We are already hearing from members that this change poses health and safety risks for immunocompromised faculty and/or their families.

"The policy is likely to impact faculty rights in the areas of health and safety and perhaps other rights as well.  In that context, CFA hereby requests to engage in the required bargaining.  Please contact me . . . to make appropriate arrangements."

Gusha responded on March 8 that the CSU did not believe the revised vaccination policy was a proper subject of bargaining because it applied only to students, not to faculty, and did not have any foreseeable impacts on matters within the scope of representation.  Gusha also noted that the parties had not

5

previously bargained over student vaccine requirements, including over the 2019 policy.  Nonetheless, Gusha said the CSU was willing to meet to allow the CFA to explain why it believed the 2023 policy had impacts within the scope of its representation.  Gusha proposed a meeting on March 16, and she asked Sheffield to provide alternative times and dates if she was not available on March 16.

On March 15, Gusha reiterated that CSU did not believe it was required to meet and confer over student vaccine requirements, but it was willing to meet to allow CFA "to explain why you believe there are impacts within your scope of representation."  Gusha requested that Sheffield advise if she was "not interested in meeting."

CFA filed an unfair practice charge with the PERB on March 8, asserting that CSU "failed to bargain in good faith with CFA in violation of Government Code §§ 3570 and 3571(c) in connection with its decision to eliminate student vaccine requirements."  Subsequently, Sheffield declined to meet informally with CSU, telling Gusha:  "The union is not interested in meeting under the terms you laid out.  We disagree with your position that the union has no right to meet and confer formally, and we filed a charge with PERB for this very reason.  [¶] Elimination of vaccinations in the CSU puts faculty at risk, and the decision does not conform with any health guidance we know of."

## III.   Hearing and ALJ decision.

The parties participated in a hearing before Administrative Law Judge (ALJ) Camille Binon in August.  Dr. Richard Pan, a medical doctor and public health expert, testified for the CFA that the best way for faculty members to protect themselves from

6

disease is by getting vaccinated.  However, some members cannot get vaccinated because they are allergic to vaccine ingredients, and others are not fully protected by vaccines because their immune systems are suppressed because they are receiving chemotherapy or immunotherapy, have a rheumatoid condition or an autoimmune disease, have had an organ transplant, or have HIV.  These members depend on "community immunity" to protect them from contagious diseases, and they might be put at risk if student vaccination levels fall below critical thresholds.  Measles is the most infectious of the diseases for which the 2019 policy required vaccination, requiring an immunization rate above 94 percent to prevent community spread.

Dr. Pan testified that in 2016, California schools enrolling kindergarten through twelfth grade (K–12) students began requiring students to show proof of vaccination.  However, not all CSU students had been subject to that requirement because they graduated high school before 2016, were homeschooled, or were educated in other states with different vaccine requirements.  Further, a meningococcal vaccine was not required for California K–12 students, there had been a significant rise in medical exemptions after 2016, and some communities had higher rates of unvaccinated students.  Accordingly, Dr. Pan opined that verifying vaccination status for all students was important to ensure community immunity at each CSU campus.

CSU's Director of Student Wellness, Dr. Carolyn O'Keefe, testified for CSU that the 2023 policy was adopted at the request of the Vice Presidents of Student Affairs (Vice Presidents).  The Vice Presidents requested the new policy for several reasons.  First, under existing state law, all pre-kindergarten through 12th grade students attending public or private schools in

California are required to show proof of immunization to enroll. Ninety four to 95 percent of CSU students matriculate from California schools, and thus the vast majority of CSU students enter the system fully immunized. Second, additional vaccination requirements apply to students who live in residence halls or who have field placements in health-related fields. Third, it creates an administrative burden for students to have to produce immunization records and for campus health centers to have to collect and input the records. Fourth, immunization requirements were to have been enforced by placing holds on student registration, and students would not learn of the holds until their registration windows had opened, thus creating barriers to registration. Fifth, socioeconomically disadvantaged students had more difficulty navigating the system and overcoming holds. For all of these reasons, the Vice Presidents believed the 2019 policy imposed an unwarranted burden on CSU students and staff. Dr. O'Keefe said there had been a "robust conversation" among the Vice Presidents about how the change in student vaccine requirements might impact community health, and it was agreed that the health impact would be negligible because 94 to 95 percent of students were coming into the system already immunized.

The ALJ issued a proposed decision in January 2024. The ALJ found that the new student vaccine requirement constituted a policy change, but such change was not within the scope of the union's representation because it did not involve "a requirement or removal of a requirement related to employees." Nonetheless, the change had "a generalized or continuing effect" on employment because "employees may suffer exposure to infectious diseases brought to the classroom by students well into

8

the future." Because of the policy's possible effect on CFA's members, the ALJ said, CSU was required to meet and confer over "alternatives to the decision as part of its effects bargaining." The ALJ concluded that CSU failed to do so, and thus violated its duty under HEERA. The ALJ ordered CSU to rescind the 2023 policy and meet and confer with CFA regarding the policy's negotiable aspects. The ALJ further ordered CSU to "make whole all affected employees for any losses incurred as a result of CSU's decision to remove requirements for student vaccinations."

## IV. CSU's statement of exceptions; PERB decision.

CSU filed a statement of exceptions to the ALJ's proposed decision, contending that the ALJ's proposed decision (1) failed to address how the student vaccination policy had a generalized effect or ongoing impact on the CFA's members' terms and conditions of employment; (2) erroneously asserted that CSU ignored CFA's demand to bargain; and (3) erroneously concluded that CSU must meet and confer over alternatives as part of effects bargaining. The CFA did not file substantive objections of its own.

PERB issued its final decision in August 2024. It noted that the CFA was no longer claiming CSU had a duty to bargain over its decision to adopt the 2023 policy, and thus PERB focused exclusively on whether CSU "violated HEERA by beginning to implement the 2023 [p]olicy before affording CFA notice and an opportunity to engage in effects bargaining." As to that issue, PERB found as follows.

First, PERB rejected CSU's assertion that the 2023 policy had no reasonably foreseeable impacts on faculty health or safety. It explained that the 2019 policy closely matched

9

guidance issued by the California Department of Public Health and the American College Health Association, which stated that the guidance was " 'important in preventing disease clusters and outbreaks on campus.' " PERB acknowledged that it was not clear how significant CSU student vaccine requirements were in avoiding campus outbreaks in light of the high percentage of students who attended California schools before college, but it noted that Dr. Pan had credibly testified that K–12 immunization requirements were not sufficient to create community immunity on CSU campuses because approximately five to six percent of CSU students came from outside California, and some California students were homeschooled or had medical exemptions. Thus, PERB concluded that while it probably was not possible to calculate the degree to which the 2023 policy increased the risk of a disease outbreak on a CSU campus, "CSU's policy change had the reasonably foreseeable result of reducing community immunity."

Second, PERB noted that where an employer's decision has reasonably foreseeable impacts on terms or conditions of employment, the employer generally violates its duty to bargain if it begins to implement the decision before giving the union advance notice and a meaningful opportunity to bargain. Here, CSU had not provided CFA with formal notice of the 2023 policy, but it was undisputed that CFA was aware of it by at least February 23, when it demanded to bargain over health and safety effects. Accordingly, CSU violated its duty to bargain unless at the time CFA learned of the decision, CSU had not begun implementing the 2023 policy and there was sufficient time to allow good faith bargaining before implementation. As to that issue, PERB said, CSU failed to prove that CFA knew of the 2023

policy before implementation began and sufficiently in advance of implementation to allow a meaningful opportunity to bargain. Specifically, PERB found that Dr. O'Keefe had admitted in her testimony that the 2023 policy was implemented in February 2023; CSU never denied that implementation was underway and never agreed to cease implementation to allow bargaining; and CSU did not challenge the ALJ's finding that implementation began in February 2023. In short, PERB said, "[f]or CSU to establish that CFA waived its right to bargain by turning down [its March 8, 2023 offer to meet and discuss], CSU had the burden to prove that it was holding off on implementation. Because the evidence before us strongly suggests the opposite, and CSU has in any event waived any argument to the contrary, CSU's argument fails."

As to remedy, PERB changed the ALJ's proposed remedy in two respects. First, it declined to direct CSU to rescind the 2023 vaccination policy, explaining that its expertise was in enforcing statutory labor relations rights and duties, not crafting student immunization policies. CSU had offered educational and public health reasons for adopting the 2023 policy, and "it is not [PERB's] role to assess the validity of those reasons from an educational or public health perspective." Further, outside the COVID-19 context, neither the CFA nor any other union had previously sought to bargain over student health policies, and CFA had declined to take CSU up on its offer to explain why the 2023 policy had bargainable effects. Although CFA was not required to meet formally for this purpose, its choice "further persuades us to err on the side of leaving the 2023 policy fully in place during bargaining." Second, PERB directed CSU to

11

reimburse CFA "for wasted or diverted resources (if any) and/or other harm resulting from CSU's violations."

The CSU filed a petition for writ of review in September 2024. This court issued a writ of review in July 2025.

## DISCUSSION

CSU contends that PERB erred by finding that CSU violated HEERA by refusing to bargain over the effects of the 2023 policy. CSU makes four specific contentions. First, CSU urges that there is not substantial evidence that it implemented the 2023 policy before CFA filed its unfair practice charge. Specifically, CSU contends that although it "adopted" the 2023 policy in February, it did not "implement" it until the fall, and thus CFA had an adequate opportunity to negotiate effects before the policy's implementation. Second, CSU contends that it did not refuse to bargain, but instead offered to meet with CFA to give the union the chance to explain why it believed the 2023 policy would have effects on faculty health. CSU says that longstanding precedent required CFA to meet with CSU to clarify its position. Third, CSU urges that PERB's conclusion that the 2023 revisions had reasonably foreseeable negotiable impacts on immunocompromised faculty members ignored federal and state laws that already give such faculty members the right to request reasonable accommodations to protect their health and safety. CSU contends that health concerns based on individual circumstances require individual accommodations under federal and state disability laws, not through collective bargaining. Finally, CSU contends that PERB's addition of an order directing CSU to "make whole" CFA itself was "vague, punitive, and unjustified."

12

As we discuss, substantial evidence supports PERB's finding that the 2023 policy had reasonably foreseeable impacts on immunocompromised faculty members, thus requiring effects bargaining. However, there is no substantial evidence that CSU had begun implementing the 2023 policy before CFA filed its unfair practices charge or that CSU refused to bargain effects. To the contrary, it is undisputed that CSU offered to meet informally to allow CFA to explain why it believed the 2023 policy had effects within the scope of representation. Accordingly, we will set aside PERB's finding that CSU violated HEERA and remand the matter for the parties to engage in effects bargaining.

## I. Legal principles.

### A. Standard of review.

This case was brought under HEERA, which governs employment relationships between public universities and their employees. (§ 3560.) Under HEERA, a union, employee, or employer may challenge an alleged violation by filing an unfair practice charge with PERB. The PERB is a five-member board empowered by the Legislature to adjudicate unfair labor practice claims under several public employment relations statutes. (*Boling v. Public Employment Relations Board* (2018) 5 Cal.5th 898, 911 (*Boling*); *Kern County Hospital Authority v. Public Employment Relations Bd.* (2024) 100 Cal.App.5th 860, 876 (*Kern County*); § 3563.) If the charge states a prima facie case of an unfair practice, PERB will issue a complaint. (*Palomar Health v. National Nurses United* (2023) 97 Cal.App.5th 1189, 1202, citing Cal. Code Regs., tit. 8, § 32640, subd. (a).) A hearing then will be held before an ALJ, who will issue a written decision

"containing a statement of the facts, law and rationale for the decision." (*Palomar*, at p. 1203, citing Cal. Code Regs., tit. 8, §§ 32215, 32350.)

A party aggrieved by an ALJ's decision may file a statement of exceptions with PERB. (Cal. Code Regs, tit. 8, § 32300, subd. (a).) If no party timely files a statement of exceptions, the ALJ's decision becomes final. (*Id.*, § 32305, subd. (a).) If a statement of exceptions is timely filed, PERB may "issue a decision based upon the record of hearing," or may "[a]ffirm, modify or reverse the proposed decision, order the record re-opened for the taking of further evidence, or take such other action as it considers proper." (*Id.*, § 32320.)

PERB's decisions are reviewable by petition for writ of review filed in the Court of Appeal, which may enforce, modify, or set aside PERB's decision or order. (§ 3509.5, subds. (a), (b); Cal. Rule of Court, rule 8.728.) Because PERB's construction of the HEERA is within its field of expertise, courts follow PERB's interpretation unless it is clearly erroneous (*Boling*, *supra*, 5 Cal.5th at pp. 911–912; *County of Sonoma v. Public Employment Relations Board* (2022) 80 Cal.App.5th 167, 178 (*County of Sonoma*)), and PERB decisions are persuasive authority on legal matters that are within its expertise (*City of Palo Alto v. Public Employment Relations Bd.* (2016) 5 Cal.App.5th 1271, 1288 (*City of Palo Alto*)). Nonetheless, " ' "[i]t is . . . 'the duty of this court, when . . . a question of law is properly presented, to state the true meaning of the statute . . . even though this requires the overthrow of an earlier erroneous administrative construction.' " ' " (*City of Palo Alto*, at p. 1288.) Thus, appellate courts "retain final authority to interpret" the HEERA (*County of Sonoma*, at p. 178), and we will not follow an

interpretation by PERB that is clearly erroneous (*City of Palo Alto*, at p. 1288).

PERB's findings of fact are conclusive "if supported by substantial evidence on the record considered as a whole." (§ 3509.5, subd. (b); *County of Sonoma*, *supra*, 80 Cal.App.5th at p. 178.) " '[S]ubstantial evidence' " is not synonymous with " 'any' " evidence, but rather evidence that is "reasonable in nature, credible, and of solid value." (*Carranza v. City of Los Angeles* (2025) 111 Cal.App.5th 388, 400, citing *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1006.) PERB's remedial orders are reviewed for an abuse of discretion. (*County of Sonoma*, at p. 178.)

## B. Public employers' statutory duty to bargain.

As noted above, HEERA provides that CSU has a duty to meet and confer in good faith with employee organizations over matters within the "scope of representation" (§ 3570)—i.e., over "wages, hours of employment, and other terms and conditions of employment" (§ 3562, subd. (r)(1)). Employers are also required to bargain over the effects and implementation of changes that fall outside the scope of representation but have reasonably foreseeable impacts on issues within the scope of representation. (*Fire Fighters*, *supra*, 51 Cal.4th at pp. 276–277.) For example, our Supreme Court has said that an employer may have the right to decide unilaterally to lay off employees for financial reasons, but nonetheless may be required to bargain about " 'the timing of the layoffs and the number and identity of employees affected.' (*Los Angeles County Civil Service Com. v. Superior Court* (1978) 23 Cal.3d 55, 64.)" (*Claremont Police Officers Assn. v. City of Claremont* (2006) 39 Cal.4th 623, 634 (*Claremont Police Officers*).)

15

"In sum, a public employer's 'duty to bargain arises under two circumstances: (1) when the decision itself is subject to bargaining, and (2) when the effects of the decision are subject to bargaining, even if the decision, itself, is nonnegotiable.' (*El Dorado County Deputy Sheriff's Assn. v. County of El Dorado* (2016) 244 Cal.App.4th 950, 956.)" (*County of Sonoma, supra,* 80 Cal.App.5th at p. 179.) All other matters "are reserved to the employer." (§ 3562, subd. (r)(2).)

Where a decision is within the scope of representation, an employer must provide notice and an opportunity to bargain before it reaches a " 'firm decision' " on the matter subject to bargaining. (*Kern County, supra,* 100 Cal.App.5th at p. 877.) If a matter is not within the scope of representation but has reasonably foreseeable *effects* within the scope of representation, the employer must provide notice and an opportunity to meet and confer *after* it has reached a firm decision but before the decision is implemented. (*County of Sonoma, supra,* 80 Cal.App.5th at p. 186, citing *Mt. Diablo Unified School District* (1983) PERB Dec. No. 373; *County of Santa Clara* (2013) PERB Dec. No. 2321-M, p. 30.)[3]

When bargaining is required, agencies may not make unilateral changes until the parties have come to an impasse. (*Boling, supra,* 5 Cal.5th at p. 914; *County of Sonoma, supra,* 80 Cal.App.5th at pp. 179–180.) Parties are not required to reach an agreement because the employer "has 'the ultimate power to

---

[3]     There is an exception to this rule, not relevant here, if the implementation date is based on an "immutable deadline" or a delay in implementation would effectively undermine the employer's right to make the nonnegotiable decision. (*County of Sonoma, supra,* 80 Cal.App.5th at p. 186.)

refuse to agree on any particular issue,' " but they must bargain in good faith and attempt to reach agreement. (*Claremont Police Officers*, *supra*, 39 Cal.4th at p. 630.)

If a proposal is outside the scope of representation and does not have negotiable effects, the employer may refuse to negotiate without committing an unfair practice. (*City of Pinole* (2012) PERB Dec. No. 2288-M, p. 7.) However, a party's refusal to discuss a proposal based on an incorrect belief that the proposal concerns a matter outside of the scope of representation is a per se violation of the duty to bargain. (*County of San Luis Obispo* (2015) PERB Dec. No. 2427-M, p. 26.)

## II. Substantial evidence supports PERB's finding that the 2023 policy had reasonably foreseeable effects on faculty health and safety.

The ALJ found that CSU's decision to adopt the 2023 policy was outside the scope of representation, and CFA did not challenge this finding. The only issue before PERB, therefore, was whether CSU violated HEERA by failing to engage in *effects* bargaining—that is, to bargain over any reasonably foreseeable effects of the 2023 policy on CFA's members. As to that issue, PERB concluded that CSU had a duty to bargain over the effects of the 2023 policy, and it engaged in an unfair practice by implementing the policy without engaging in such bargaining. CSU challenges both conclusions, urging that there was no duty to bargain effects, and there is no substantial evidence that it began implementing the 2023 policy before CFA filed its unfair practices complaint.

We begin with the duty-to-bargain issue: Whether substantial evidence supports the PERB's finding that the 2023 policy had reasonably foreseeable effects on health and safety,

17

requiring CSU to engage in effects bargaining.  As to that issue, CSU urges that the testimony before the ALJ suggested, at most, that the 2023 policy could have impacts on immunocompromised faculty, *not* faculty generally.  While CSU does not dispute that there may be a duty to bargain effects even if such effects do not impact the entire bargaining unit, it urges that any theoretical health impacts the 2023 policy might have on immunocompromised faculty members were already fully addressed by CSU's obligations to reasonably accommodate those faculty members under the Americans with Disabilities Act (ADA; 42 U.S.C. § 12101 et seq. and the Fair Employment and Housing Act (FEHA; § 12900 et seq.).  That is, CSU contends that there is no duty to bargain effects because the only negotiable impacts CFA has identified are health impacts on immunocompromised faculty members, and "the ADA/FEHA processes that formed part of the relevant *status quo* already provided a mechanism that fully and completely addressed and prevented any such health impacts."  Respondents disagree, contending that the ADA and FEHA do not trump CSU's bargaining obligations under HEERA, and thus CSU had a duty to bargain effects notwithstanding its obligations under the ADA and FEHA.

CSU notes, correctly, that as an employer, it is required by law to "make reasonable accommodation" for an employee's known physical disability, including any disease or disorder that affects an "immunological" system and limits a "major life activity."  (§§ 12940, subd. (m), 12926, subd. (m).)  Relatedly, CSU is required "to engage in a timely, good faith, interactive process with the employee . . . to determine effective reasonable accommodations, if any, in response to a request for reasonable

18

accommodation by an employee or applicant with a known physical . . . disability." (§ 12940, subd. (n).) A reasonable accommodation is " ' "a modification or adjustment to the workplace that enables the employee to perform the essential functions of the job held or desired." ' " (*Wentworth v. Regents of University of California* (2024) 105 Cal.App.5th 580, 597.) Thus, existing law provides an avenue for an immunocompromised faculty member to seek accommodations for any health risks posed by exposure to unvaccinated students, and nothing in the record suggests that this avenue will not fully ameliorate any health and safety effects of the 2023 policy on immunocompromised faculty.

CSU is also correct that unions may represent employees in ADA/FEHA accommodations meetings upon the employees' request. Specifically, in *Sonoma County Superior Court* (2015) PERB Dec. No. 2409-C, pp. 24–25 (*Sonoma I*), PERB held that the statutory right of union representation "includes an employee's right to have a union representative assist him or her in the interactive process by attending meetings with the employer convened to explore possible reasonable accommodations to an employee's disability. The union has a concurrent right to represent the employee in the interactive process . . . if the employee requests union representation." (See also *Sonoma County Superior Court* (2017) PERB Dec. No. 2532-C, p. 21 [affirming holding in *Sonoma I* "that employees are entitled to union representation upon request in interactive process meetings convened for the purpose of determining whether reasonable accommodation is needed, and if so, what that accommodation will be"].) Thus, whether or not CFA has the right to bargain over the effects of the 2023 policy, it will have a

role to play (upon request) in crafting reasonable accommodations to meet the needs of immunocompromised faculty members.

Notwithstanding the foregoing, we note that the United States Supreme Court and lower federal courts have held that laws prohibiting discrimination do not preclude enforcement of the right to be free from discrimination through the collective bargaining process. (See, e.g., *Emporium Capwell Co. v. Western Addition Community Organization* (1975) 420 U.S. 50, 69 ["[t]he elimination of discrimination and its vestiges is an appropriate subject of bargaining, and an employer may have no objection to incorporating into a collective agreement the substance of his obligation not to discriminate in personnel decisions"]; *International Union of Elec., Radio and Mach. Workers, AFL-CIO-CLC v. N.L.R.B.* (D.C. Cir. 1980) 648 F.2d 18, 25, fn. 6 ["Elimination of discrimination is a mandatory subject when raised on either side of the collective bargaining table"]; *Graphic Arts Internat., Union Local No. 280 v. N.L.R.B.* (9th Cir. 1979) 596 F.2d 904, 911–912 ["both the Supreme Court and the [National Relations Labor Board (Board)] have held that '(t)he elimination of discrimination and its vestiges is an appropriate subject of bargaining . . . .' [Citations.] And the Board has found that an employer's failure to bargain in good faith about eliminating discrimination can constitute an unfair labor practice"].) The PERB has similarly concluded, finding that "the existence of comprehensive legislation prohibiting both categorical discrimination and discrimination for union activity does not preclude enforcement of those rights through the collective bargaining process." (*Healdsburg Union High School District* (1984) PERB Dec. No. 375E, p. 12; see also *Jefferson*

20

*School District* (1980) PERB Dec. No. 133, pp. 7–8 [rejecting as "without foundation" employer's contention that any matter covered by existing statute was excluded from scope of representation]; *San Mateo City School Dist. v. Public Employment Relations Bd.* (1983) 33 Cal.3d 850, 866 [inclusion of terms established by statute in collective bargaining agreement "would not supersede the relevant part of the [statute], but would strengthen it"].)

Unquestionably, a single form of accommodation will not be appropriate for all immunocompromised faculty members, and there are, as CSU suggests, good reasons to believe that the needs of some such members will be most effectively met through individualized accommodations. (See, e.g., *Oconomowoc Residential Programs v. City of Milwaukee* (7th Cir. 2002) 300 F.3d 775, 784 ["Whether a requested accommodation is reasonable or not is a highly fact-specific inquiry and requires balancing the needs of the parties"]; *Nunes v. Wal-Mart Stores, Inc.* (9th Cir. 1999) 164 F.3d 1243, 1247 [determining whether a proposed accommodation is reasonable "requires a fact-specific, individualized inquiry"].) Still, other faculty members may prefer union representation and bargaining on the issue.

Because we see no indication that the Legislature intended to allow employees to seek disability accommodations permitted by FEHA and the ADA *only* through individual negotiations, to the exclusion of collective bargaining, we conclude that substantial evidence supports the PERB's conclusion that the 2023 policy was a proper subject of effects bargaining.

## III. Substantial evidence does not support PERB's conclusion that CSU violated its duty to bargain effects.

Having concluded that CSU had a duty to bargain over reasonably foreseeable effects of the 2023 policy, we turn to the second issue on which CSU sought writ review: Whether CSU violated that duty. CSU concedes that it did not give CFA formal notice of the 2023 policy, but it contends CFA learned of the change and requested bargaining before the policy was implemented. CSU also contends that it did not refuse to bargain, but instead asked CFA to clarify why it believed the policy had bargainable effects. For the reasons that follow, CSU is correct on both issues.

### A. Substantial evidence does not support PERB's conclusion that CSU had begun implementing the 2023 policy before CFA filed its unfair practice charge in March 2023.

As we have noted, an employer has a duty to provide notice and an opportunity to bargain over the reasonably foreseeable effects of a nonnegotiable decision once the employer reaches a " 'firm decision' " and before implementing the decision. (*County of Sonoma, supra*, 80 Cal.App.5th at p. 186.) However, if an employer does not give formal notice of a decision but the employee organization receives actual notice before the decision is implemented, the employer's failure to give formal notice " 'is of no legal import.' " (*California Correctional Peace Officers Association* (2011) PERB Dec. No. 2196-S, p. 8, overruled on other grounds by *County of Santa Clara, supra*, PERB Dec. No. 2321-M; see also *County of Riverside* (2010) PERB Dec. No. 2097-

22

M, p. 12, overruled on other grounds by *County of Santa Clara, supra*, PERB Dec. No. 2321-M; *Regents of the University of California* (1987) PERB Dec. No. 640-H, p. 22.)

Here, it is undisputed that CSU did not provide formal notice to CFA of the 2023 policy, but that CFA knew of the change at least by February 23—nine days after the policy's adoption—when CFA submitted its initial demand letter. CSU's failure to give formal notice therefore was not legally significant if, at the time CFA learned of the new policy, CSU had not yet begun implementing the policy and there was sufficient time for CFA to seek bargaining prior to implementation. (*City of Sacramento* (2013) PERB Dec. No. 2351-M, pp. 29–30; *County of Santa Clara, supra*, PERB Dec. No. 2321-M, pp. 30–31.)

CFA contended below, and PERB agreed, that by the time CFA filed its unfair practices complaint on March 8, CSU had not only *adopted* the 2023 policy, but also had begun *implementing* it. CSU challenges this finding, urging that there is no substantial evidence that it had begun implementing the new student vaccine policy prior to March 8. Respondents contend that CSU forfeited this issue by failing to raise it below and, further, that it fails on the merits.[4]

---

[4] Below, PERB noted that the charging party usually has the burden of proof in a unilateral change case. PERB nonetheless placed the burden of proving implementation on CSU because it believed implementation was relevant to "a waiver defense for which [CSU] bears the burden of proof."

None of the parties addresses the burden of proof issue directly, but all assert that the proper standard of review on appeal is substantial evidence. The substantial evidence standard applies on appeal only if CFA had the burden of proof

As an initial matter, we reject respondents' claim that CSU did not raise the implementation issue below. The ALJ found that CSU did not meet and confer in good faith prior to implementing the 2023 policy, and its conduct was "not excused by offering to meet and discuss with CFA *after the fact*." (Italics added.) CSU's exceptions directly challenged this finding, asserting that "[t]he proposed decision erroneously asserts [CSU] violated HEERA by offering to meet and discuss with CFA '*after the fact*.'" (Italics added.) CSU therefore did not forfeit the issue.

On the merits, decisions of the PERB hold that an employer begins to "implement" a decision when it takes concrete steps to carry out the decision. For example, in *Oakland Unified School District* (2023) PERB Dec. No. 2875, page 8, the PERB held that a Board of Education "began implementing" a decision to close schools when it "notif[ied] impacted staff that they would be

_____

below; if *CSU* had the burden below, we could reverse only if the evidence compels a finding for it as a matter of law. (See, e.g., *Visalia Unified School Dist. v. Public Employment Relations Bd.* (2024) 98 Cal.App.5th 844, 877 ["'"In [a] case where the trier of fact has expressly or implicitly concluded that the party with the burden of proof did not carry the burden and that party"' seeks review, the reviewing court does not ask '"whether substantial evidence supports the judgment."' [Citation.] Rather, '"where the issue on [review] turns on a failure of proof . . . , the question for [the] reviewing court becomes whether the evidence compels a [contrary] finding . . . as a matter of law"'"].)

Because the issue of waiver is not before us, we conclude that CFA, as the charging party, had the burden of proof on implementation. As the parties conceded, our review thus is for substantial evidence.

24

transferred" and "began . . . working with impacted families to choose new schools." Similarly, in *Regents of the University of California* (2023) PERB Dec. No. 2852-H, page 18, the PERB held that a university had begun "implement[ing]" a decision to eliminate concurrent exempt and nonexempt appointments when it rescinded an employee's appointment as lecturer. And, in *City of Sacramento, supra*, PERB Dec. No. 2351-M, at page 2, the PERB held that a public employer began "implementing" a plan to reorganize a police department's communications center "by meeting with the affected employees and redistributing their 'essential' job duties." In contrast, in *Pasadena Area Community College District* (2011) PERB Dec. No. 2218, p. 2 (adopting proposed decision, p. 5), the PERB found that a community college district's decision to cancel the winter intersession, without more, did not constitute implementation of that decision.[5]

In the present case, there is no substantial evidence that CSU had taken any concrete steps to implement the 2023 policy before CFA filed its unfair practices complaint on March 8. Indeed, the only evidence concerning implementation is that *by mid-August*—more than five months after CFA filed its

---

[5]     CFA suggests that *Anaheim Union High School Dist.* (1982) PERB Dec. No. 201, page 10, held that a school district implemented a change at the time it adopted a resolution reducing employee salaries, even though the reduction would not take effect for several months. Not so. *Anaheim Union* concerned a change within the scope of representation, and thus the issue before the PERB was whether the change was a firm decision or merely an " 'initial proposal' "—*not* whether the adoption of the decision constituted implementation. (*Id.* at pp. 2, 10.)

complaint—two campuses had posted information on their websites informing students about new vaccine requirements effective in fall 2023. As CSU notes, the fact that two campuses posted new student vaccine requirements in August 2023 does not support the conclusion that CSU implemented the 2023 policy *six months earlier* in February 2023.

Respondents contend that CSU implemented the 2023 policy immediately upon its adoption in February because the university "ce[ased] its work to implement the 2019 Policy." But there is no evidence of any cessation. In fact, the only evidence CFA identifies of a February implementation is a July *2021* memorandum from the Associate Vice Chancellor for Student Affairs to the CSU Vice Presidents for Student Affairs. The memorandum says that all CSU campuses must be in full compliance with the 2023 policy starting "with the new student cohort matriculating in fall 2023," and that for "planning purposes," "implementation must be initiated by Fall 2022 and completed by early Spring 2023." CFA suggests that this memorandum is evidence that implementation of the 2019 policy necessarily "ground to a halt" when the 2023 policy was adopted in February. But on its face, all the memorandum does is set out administrative guidance for campuses' "planning purposes." It provides *no* information—nor could it—about what preparations were actually underway nearly two years later.[6] Further, Dr. O'Keefe testified that the discussions among the Vice

---

[6] Indeed, if the memorandum accurately described the rollout of the 2019 policy, implementation should have been completed by "early spring"—i.e., by February or March. If that were the case, there would have been no implementation to "halt" when CSU adopted the 2023 policy on February 14.

Presidents that culminated in the adoption of the 2023 policy occurred "*prior to* [*the 2019 policy's*] *implementation* in the fall of 2023." (Italics added.) The only reasonable construction of this testimony is that implementation of the 2019 policy had not begun—and therefore could not have "ceased"—when CSU adopted the 2023 policy in February.

Respondents also contend that Dr. O'Keefe's testimony provided substantial evidence of implementation, noting that O'Keefe said that the 2023 policy " 'was implemented in February 2023.' " It is true that O'Keefe referred in her testimony to "the policy that *was implemented* in February of 2023," but O'Keefe appeared to have used "implemented" colloquially, to mean "adopted" or "enacted."[7] (Italics added.) Significantly, Dr. O'Keefe was not asked about, and did not testify, that any campus had begun taking concrete steps to put the new policy into effect in February 2023. Indeed, although CFA's counsel

---

[7]  The full question and answer was as follows:

"Q:  And so under the previous policies, were . . . different campuses of the CSU required to verify MMR and meningococcal screening for a student as an enrollment requirement?

"A:  I don't believe meningococcal screening was a requirement. I believe that MMR and chickenpox as well as tuberculosis screening were the requirements. There was also at some point a subsequent law that requires, which is still in effect, that requires any students that are 18 and younger to either provide proof of vaccination against Hepatitis B . . . . So prior to the policy that was implemented in February of 2023, the requirement on the campuses was for MMR, chickenpox and tuberculosis screening as well as students that are 18 and younger to have that Hepatitis B immunization or proof of immunization."

27

cross-examined Dr. O'Keefe about the adoption of the 2023 policy, counsel did not ask her whether CSU had begun implementing the 2019 policy prior to February, whether that implementation ceased once the 2023 policy was adopted, or whether, in the approximately three weeks between February 14 and March 8, CSU took any concrete steps to begin implementing the 2023 policy. On this record, therefore, Dr. O'Keefe's testimony is not substantial evidence that CSU was already implementing the 2023 policy when CFA filed its unfair practices charge.

Respondents also suggest that in her written correspondence with Sheffield in February, Gusha "never denied CFA's statement . . . that 'planning and implementation are proceeding.' " But as CSU notes, Gusha *did* deny that CSU had begun implementing the 2023 policy, noting that the policy "only applies to . . . students . . . entering the California State University (CSU) in or after fall 2023."

Finally, respondents contend that the executive order adopting the 2023 policy provides evidence of implementation because it stated that the policy was "effective" on February 14, 2023. But on its face, the "effective" date is the date the policy was adopted, not the date on which it was implemented. Indeed, the policy states that it "applie[d]" "in or after fall 2023."[8]

---

[8] Respondents also urge this court to reject CSU's suggestion that the 2023 policy was not implemented until students arrived on campus in fall 2023. We need not reach this issue because the only question before us is whether CSU had implemented the policy prior to CFA's filing of its unfair practices complaint *on March 8*. (See, e.g., *County of Santa Clara, supra*, PERB Dec. No. 2321-M, at p. 31 [if employer has duty to bargain effects, "its implementation without giving such notice and an opportunity to

For all of these reasons, the administrative record is devoid of any substantial evidence to support PERB's conclusion that CSU had begun implementing the 2023 policy in February or March 2023.

## B.     There is no substantial evidence that CSU refused to bargain effects.

Because there is no substantial evidence that CSU had begun implementing the 2023 policy prior to March 8, CFA's unfair bargaining charge necessarily fails unless, as CFA contends, CSU had definitively refused to bargain over effects prior to March 8.  CSU contends that it never refused to bargain, but instead offered to meet informally to allow CFA to explain why it believed the student vaccine policy had bargainable effects.  Respondents urge that any discussion of effects had to occur "at the bargaining table," and thus that CSU's offer to meet informally was not sufficient.

"Because bargaining over effects contemplates that negotiations will occur prior to implementation of the non-negotiable decision, the parties must assess the effects of the decision *prospectively*, without the benefit of hindsight." (*Trustees of the California State University* (2012) PERB Dec. No. 2287-H, p. 14.)  It thus is not uncommon for a union and an employer to "disagree over what effects are possible and within the scope of representation."  (*Rio Hondo Community College District* (2013) PERB Dec. No. 2313-E, p. 5 (*Rio Hondo*).)  If so, "[u]pon receiving an effects bargaining demand, and before refusing to negotiate, an employer must attempt to clarify

---

bargain constitutes a refusal to bargain"].)  Any subsequent implementation date is not relevant to our analysis.

through discussions with the union any uncertainty as to what is proposed for bargaining and whether it falls within the scope of representation." (*Ibid.*; see also *Healdsburg Union High School District and Healdsburg Union School District / San Mateo City School District* (1984) PERB Decision No. 375, at pp. 8–10 (*Healdsburg / San Mateo*) [employer must "make a good faith attempt to seek clarification of questionable proposals by voicing its specific reasons for believing that a proposal is outside the scope of representation and then entering into negotiation on those aspects of proposals which, following clarification by the other party, it finally views as negotiable"].) The PERB has held that "[r]efusing an effects bargaining demand without first attempting to clarify ambiguities and or whether matters proposed for bargaining fall within the scope of representation, violates the duty to bargain in good faith." (*Rio Hondo*, at p. 5; see also *Healdsburg / San Mateo*, at p. 10 ["Where a proposal is arguably negotiable in whole or in part, a failure to seek clarification is, in itself, a violation of the duty to negotiate in good faith"].)

Some PERB decisions suggest that the clarification contemplated by this rule may take place informally, through "discussions" between the employer and employee representative. (See, e.g., *Bellflower Unified School District* (2014) PERB Dec. No. 2385, p. 7, italics added ["[B]efore an employer may refuse to negotiate after receiving an effects bargaining demand, it 'must attempt to clarify *through discussions with the union* any uncertainty as to what is proposed for bargaining and whether it falls within the scope of representation' "]; *County of Santa Clara*, *supra*, PERB Dec. No. 2321-M at p. 32 [party objecting that proposal is beyond scope of representation must make good faith

30

effort at clarification by voicing specific reasons for believing proposal is outside the scope of representation].) But as respondents note, other decisions say that clarification must take place "at the bargaining table." (See *Rio Hondo*, *supra*, PERB Dec. No. 2313-E, at p. 12 ["the proper place to clarify bargaining demands and proposals is at the bargaining table itself"]; see also *City of Palo Alto* (2017) PERB Dec. No. 2388a-M, pp. 33–34 ["Where an employer believes that the subject over which an employee organization desires to meet and confer exceeds the employer's duty to meet and confer, or an employer is otherwise in doubt as to its meet and confer obligation, the employer must seek clarification. . . . We conclude that such clarification should occur within the meet and confer process, not merely by the exchange of legal positions through correspondence or in comments between party representatives at public meetings of the governing authority of the agency"].)[9]

The tension between these approaches is illustrated in *County of Orange* (2018) PERB Dec. No. 2594-M. There, a majority of the PERB held that "it is well settled that the parties have a duty *to utilize the bargaining process* to resolve any ambiguities in their bargaining proposals." (*Id.* at p. 27, italics added.) In a thoughtful dissent, one PERB member disagreed, explaining as follows:

---

[9] *Trustees of the California State University*, *supra*, PERB Dec. No. 2287-H, on which CFA relies, does not address the issue before us. That decision holds only that CSU's duty to bargain is not satisfied by a "*post implementation* willingness to 'discuss' " the change. (*Id.* at p. 20, italics added.) Here, because there is no substantial evidence of implementation, the decision is inapposite.

31

"The majority primarily relies on *Jefferson School District* (1980) PERB Decision No. 133 and *Healdsburg Union High School District and Healdsburg Union School District/San Mateo City School District* (1984) PERB Decision No. 375 (*Healdsburg/San Mateo*), where the Board held that an employer has a duty to meet with an employee organization to clarify the terms of an ambiguous union proposal to determine whether the proposal concerns a subject within the scope of representation; the employer cannot perfunctorily declare the proposal outside scope and refuse to bargain over it. (*Jefferson School District, supra*, PERB Decision No. 133, p. 11; *Healdsburg/San Mateo, supra*, PERB Decision No. 375, pp. 9–10.) The majority also relies on *County of Santa Clara* (2013) PERB Decision No. 2321-M and *Bellflower Unified School District* (2014) PERB Decision No. 2385, in which the Board held that an employer has a duty to meet with an employee organization to clarify whether the union's demand to bargain the effects of a non-negotiable management decision encompasses any effects within the scope of representation. (*County of Santa Clara, supra*, PERB Decision No. 2321-M, pp. 31–32; *Bellflower Unified School District, supra*, PERB Decision No. 2385, p. 7.)

"These decisions address the employer's obligation to seek clarification of a union proposal or demand that may or may not encompass subjects within the scope of representation. No decision says that when an employer takes an action it believes to be outside the scope of representation, it must meet and confer with employee organizations over whether the action is in fact a mandatory bargaining subject. But that is the rule the majority adopts today.

"The majority's new rule creates two big problems. First, it allows employee organizations to demand bargaining over non-negotiable management decisions in the guise of 'clarifying' whether the decision is within the scope of representation. This necessarily undermines the employer's right to make the non-negotiable decision.

"Second, the majority's new rule absolves charging parties of their burden of proof in unilateral change cases like this one. In a unilateral change case, the charging party bears the burden of proving that the challenged employer action concerned a subject within the scope of representation. (*County of Santa Clara, supra,* PERB Decision No. 2321-M, at p. 13; PERB Reg. 32178.) If PERB is unable to determine from the record whether the employer's action was within the scope of representation, the charging party has not met its burden and the allegation must be dismissed. Here, as the majority admits, the record does not prove that [the proposed change] is within the scope of representation. Yet the majority nonetheless finds a unilateral change violation." (*County of Orange, supra,* PERB Dec. No. 2594-M, pp. 53–55 (dis. & conc. opn.), fn. omitted.)

We agree with the dissenting opinion in *County of Orange* that an employer may satisfy its duty to seek clarification *either* "at the bargaining table"—that is, by formally meeting and conferring—*or* through an informal exchange between parties. As the *County of Orange* dissent notes, requiring that clarification take place through formal bargaining eviscerates the distinction between bargainable and nonbargainable matters and allows employee organizations to demand bargaining over even non-negotiable management decisions. Nothing in the HEERA's

requirement that parties meet and confer "on all matters within the scope of representation" (§ 3570) requires this result.

In the present case, while CSU advised CFA that it did not believe it was required to bargain over the effects of the 2023 policy, it did not refuse to bargain. Instead, through Stefanie Gusha, CSU offered—twice—to meet to allow CFA to explain why it believed the policy had impacts within the scope of representation. This offer to meet and discuss whether the 2023 policy had bargainable effects satisfied the CSU's duty to seek clarification of CFA's demand.

Because there is no substantial evidence that CSU refused to engage in effects bargaining before implementing the 2023 policy, the PERB erred in finding that CSU violated HEERA. We therefore vacate the PERB's contrary findings and associated remedy.

## DISPOSITION

We affirm PERB's finding that the student vaccine requirements are subject to effects bargaining, and we set aside its finding that CSU violated HEERA by refusing to engage in effects bargaining before implementing the 2023 vaccine policy. We also set aside PERB's make-whole remedy. Each party shall bear its own appellate costs.

**CERTIFIED FOR PUBLICATION**


                                                    HANASONO, J.


We concur:



                    EGERTON, Acting P. J.



                    ADAMS, J.

35